**In re Lee A. COPLAN et ux., Debtors.**

**Bankruptcy No. 90–04937–BKC–6C7.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

June 30, 1993.

Bernard C. O'Neill, Jr., Patricia L. Daugherty, Orlando, FL, for debtors.

George E. Mills, Jr., Orlando, FL, trustee.

David R. McFarlin, Orlando, FL, for trustee.

Daniel C. Johnson, Orlando, FL, for AT & T Credit Corp.

## MEMORANDUM OPINION AS TO CONTESTED MATTERS INITIATED BY OBJECTIONS TO DEBTORS' CLAIMS OF EXEMPTIONS

C. TIMOTHY CORCORAN, III,
Bankruptcy Judge.

These contested matters test the limits of what some euphemistically call "pre-bankruptcy planning" by new Floridians who seek to benefit from Florida's nationally recognized liberal exemption laws. In

this case, the debtors incurred substantial indebtedness in their home state of Wisconsin, moved to Florida, converted their non-exempt assets into property that is exempt under Florida law, and then filed a Chapter 7 petition here. They thus seek to discharge their debts and keep their newly "exempted" property. Upon the objection of their largest creditor and the Chapter 7 trustee, the court is required to call a foul, holding that the debtors have exceeded permissible limits.

## I.

### Procedural Posture

On December 5, 1990, the debtors, Lee A. and Rebecca Jane Coplan, filed a joint petition for relief under Chapter 7 of the United States Bankruptcy Code. George E. Mills, Jr., is the Chapter 7 trustee of the debtors' estate.

In their bankruptcy schedules, the debtors claimed their house located at 2120 Mallard Circle, Winter Park, Florida, and two annuities, one in favor of the debtor husband and one in favor of the debtor wife, as exempt from property of the estate within the meaning of Section 522 of the Bankruptcy Code. AT & T Credit Corporation ("AT & T") and the trustee (collectively "objectors") filed objections (Documents Nos. 20 and 21) to the debtors' claims of exemption of these assets, thus initiating contested matters within the meaning of F.R.B.P. 9014. The debtors filed responses to the objections (Documents Nos. 28 and 29). The court accordingly conducted a joint evidentiary hearing of this matter on September 3, 1991. Prior to the commencement of that hearing, the objectors withdrew their objection to the exemption of the debtor husband's annuity.

## II.

### Factual Background

Before November of 1989, Lee and Rebecca Coplan resided in the state of Wisconsin where Mr. Coplan was engaged in business. Mr. Coplan had been employed for approximately 14 years by a Chapter S corporation known as Coplan's Super Appliance and TV, Inc., a company that owned and operated a retail appliance store conducting business under the name Coplan's Appliance & Home Entertainment Superstore. AT & T provided financing to the business through a line of credit and was the primary creditor of the business. Sometime in 1988, Mr. Coplan acquired a one-half ownership interest in the business from his father. In May of 1989, Mr. Coplan executed a personal guaranty in favor of AT & T Credit Corporation in replacement of the personal guaranty previously executed by his father.

By September of 1989, the business had deteriorated substantially. In fact, the debtors' 1989 tax return reflects that Mr. Coplan's 50 percent interest in the business resulted in a loss to him of $44,264 with a net loss to the business, as a whole, of $88,528 that year.

Mr. Coplan resigned his position with the business in November of 1989. He testified that he had decided to resign his position with the business in August of 1989, citing as reasons unhappiness with what he had been doing, a dishonest business partner, emotional stress relating to the job, problems with his parents, and deterioration in the performance of the company. Although Mr. Coplan interviewed with several companies in Wisconsin and received offers prior to his resignation, he did not accept employment with any company in Wisconsin. Mr. Coplan further testified that he relocated to Florida in pursuit of "job opportunities" with Amana and Disney, although he had no job offer from either of those companies and none was forthcoming until a considerable time after he moved here.

Subsequently, on November 29, 1989, the debtors closed the sale of their home in Wisconsin. The successful bid for the home was received and accepted almost immediately after the house was placed on the market. One day after the completion of the sale of the Wisconsin home, the debtors closed the purchase of the house located in Winter Park, Florida. They paid $228,000 in cash for the house, using virtually all of the proceeds obtained in the sale

of the Wisconsin house. Thus, the Coplans completed the entire process of selling one home and purchasing another half way across the country in the space of less than one month. The Coplans then moved to Florida in December of 1989. Mr. Coplan's partner continued to run the business in Wisconsin. In June, 1990, the business ceased operations.

On December 26, 1989, Mr. Coplan purchased an annuity from Pacific Fidelity Life Insurance Company for $20,932.29 with funds held by him in his individual retirement account (IRA). On the same day, Mrs. Coplan also purchased an annuity from Pacific Fidelity Life Insurance Company for $14,741.53 with funds held by her in her IRA. Mrs. Coplan did not work outside the home, and she had no earnings or compensation. She testified that her IRA had been funded in part by gifts made by her parents.

Sometime in early 1990, Park State Bank obtained a judgment in Wisconsin against the debtors jointly for approximately $50,-000. In April of 1990, AT & T filed suit against Mr. Coplan in the United States District Court for the Eastern District of Wisconsin to collect on the guaranty. In July of 1990, AT & T obtained a consent judgment in its favor and against Mr. Coplan in the amount of $1,081,839.69.

In August of 1990, Mr. Coplan obtained full-time employment with Amana in Florida. Prior to that time, his only employment had been on a part-time basis as an appliance sales representative for Sears and Roebuck at a Sears retail store. During this extended period without regular employment, the Coplans liquidated nearly all of their non-exempt assets and used the proceeds on which to live.

On December 5, 1990, the debtors filed their petition under Chapter 7 of the Bankruptcy Code in this court. The schedules reflect that there was little or no non-exempt property available to the estate.

## III.

### The Homestead Issue

Pursuant to Section 541 of the Bankruptcy Code, the filing of a bankruptcy petition creates an estate that consists of all property of the debtor. The exemption of property which is ordinarily subject to administration by the estate is governed by Section 522 of the Bankruptcy Code. In this case, no one disputes that the debtors are bona fide Florida residents. Thus, the relevant exemption statutes are found in Florida law because Florida has opted out of the federal exemptions. 11 U.S.C. § 522(b); *Fla.Stat.* § 222.20.

Article X, Section 4(a)(1), of the Florida Constitution provides that homestead property may be claimed as exempt to its full value and may thus be protected from the reach of creditors. The objectors do not take issue with this general proposition but argue that the debtors' right to exempt their homestead is subject to qualification where the exempt property has been impermissably converted from non-exempt assets. The leading reported decision on this issue in this court is *In re Schwarb*, 150 B.R. 470 (Bankr.M.D.Fla.1992).[1]

In *Schwarb*, the debtors in a Chapter 11 case used non-exempt assets to purchase fully paid annuities and to pay off the mortgage on their homestead. A creditor objected to the exemption of the annuities and the homestead on the grounds that there had been fraudulent pre-bankruptcy planning. The court sustained the objections to these exemptions. *Id.* at 473. The court found that a "systematic conversion of assets" had occurred and held that, where a non-exempt asset is converted to an exempt asset for the "specific purpose of placing the asset out of the reach of creditors," the right to exemption for that asset is forfeited. *Id.* In reaching its conclusion, the court considered the surrounding circumstances to determine whether

---

**1.** Although *Schwarb* is a recently published decision by Chief Judge Alexander L. Paskay, practitioners in the Orlando division of the court will recognize that it is in full accord with the bench and unpublished decisions the undersigned judge has been making since I have been assigned in this division.

the debtor had engaged in fraudulent pre-bankruptcy planning. *Id.* at 472–73.

■ The central question in the instant case, therefore, is whether, considering all the circumstances, the debtors' relocation to Florida with the attendant purchase of the Winter Park home was for the specific purpose of shielding their assets from creditors. The court concludes that it was.

If the debtors had retained their Wisconsin home, the judgments entered in favor of Park State Bank and AT & T would have attached to the property. *Wis.Stat.* § 766.-55(2)(b). Further, the house would have become an asset of the bankruptcy estate had the debtors filed for bankruptcy in Wisconsin. *See, e.g., In re Blodgett,* 115 F.Supp. 33, 35 (E.D.Wis.1953). In addition, under Wisconsin law, the debtors would have been limited to an exemption of only $40,000 on their homestead, rather than its full value. *Wis.Stat.* § 815.20(1).

The objectors argue that the Coplans relocated to Florida solely for the purpose of obtaining the benefit of the generous Florida exemptions. In contrast, the debtors contend that their primary objective in relocating was to pursue job opportunities for Mr. Coplan and to alleviate stress. The debtors have suggested that Mr. Coplan, despite the knowledge that the business was operating at a loss and had an uncertain future, refused one or more job offers in Wisconsin because of low salary and the desire to move and instead came to Florida in the bare hopes of obtaining better employment.

■ The Coplans' testimony on these points is not credible.[2] The evidence clearly establishes that the business was deteriorating in the months immediately preceding the move. In fact, the business posted a substantial loss for the 1989 year. Mr. Coplan was painfully aware that, in the event the business defaulted on its obligation to AT & T, he was personally liable. In addition, Mrs. Coplan admitted the debtors knew their house in Wisconsin was subject to forced sale to satisfy the claims of their creditors and that a homestead in Florida was fully exempt. More importantly, she acknowledged on adverse examination that the move to Florida was for the purpose of obtaining the more generous homestead exemption.

The debtors have further argued that the fact that the house was purchased more than one year before the date of the filing of their Chapter 7 case insulates the claim of exemption from objection. The foundation for their argument appears to be Section 548 of the Bankruptcy Code. That section provides a one year statute of limitations for actions to set aside fraudulent transfers. This matter, however, is not a fraudulent conveyance action, and Section 548 does not therefore apply. Instead, this matter is being decided on the basis of Section 522; in that section of the Bankruptcy Code, there are no strictures in regards to time as there are in Section 548.

In considering issues of this sort, however, the timing of the conversion of assets from non-exempt to exempt status is a factor to be considered in determining whether there was a specific intent to

**2.** Following the completion of the evidentiary hearing held on the objections to claims of exemptions, AT & T filed a motion to reopen the evidence (Doc. No. 43). AT & T alleged that the debtors perjured themselves in giving this testimony. AT & T sought the opportunity to present evidence to contradict the testimony the debtors gave. The debtors filed a responsive motion to strike (Document No. 47). The court heard the motions on December 4, 1991, and the court took the motions under advisement.

The court deems the motions to be moot and unnecessary because the court does not find the debtors' testimony, especially that complained about in the AT & T motion to reopen, to be credible. In addition to the internal inconsis-

tencies in the testimony that were highlighted during adverse examination, the court carefully observed the demeanor of the debtors as they testified. The court is satisfied, therefore, that the debtors' testimony is unworthy of belief on these key points so that no purpose would be served by reopening the evidence. The court has therefore not considered for purposes of the motion to reopen, the responsive motion to strike, or on the merits of the contested matters the affidavits filed by AT & T and the debtors in support of their respective motions.

For these reasons, the court is contemporaneously entering a separate final order denying as moot the motion to reopen the evidence and the responsive motion to strike.

shield assets from creditors. As a general rule, all other things being equal, the more distant the conversion, the less likely the court will be to find that the conversion was part of a specific plan to exclude the property from the reach of creditors. Nevertheless, timing is just one factor to be considered in examining this question.

In the circumstances of this case, the fact that the debtors purchased the Winter Park house one year and five days before the filing of the Chapter 7 bankruptcy petition fails to save the exemption. The debtors are financially sophisticated; they were fully able to appreciate the personal financial ramifications of a faltering business. As soon as it became apparent that the business was failing, the debtors undertook a well considered and carefully orchestrated series of maneuvers for the purpose of shielding their assets from the reach of their creditors. They had the foresight and the resources to wait one year following the conversion of their Wisconsin homestead to a Florida homestead before filing their bankruptcy petition. In fact, although the debtors paid cash for the house, they systematically liquidated their non-exempt assets during that year. Because Mr. Coplan was unemployed for much of that time, the family lived on the results of this liquidation.

The fact that the filing so closely fell upon the expiration of the one year anniversary of the conversion of the property to a fully exempt form itself adds support to the court's conclusion that this was part of a well planned scheme. The debtors sold their home in Wisconsin in a rush. They selected and purchased the home in Florida in an equally fast fashion. The purchase price was, almost to the penny, the same as the net proceeds received from the sale of the Wisconsin home. The debtors then moved to Florida without any job commitment for the only breadwinner for the family, having rejected job offers in Wisconsin. Indeed, it appears the Coplans rushed here once they recognized the hopelessness of their business enterprise so they could put the maximum amount of time between the conversion of their assets and their inevitable bankruptcy filing.

This case is plainly unlike the situation where, following conversion of assets, an unexpected disaster occurs that pushes a debtor into bankruptcy and thus necessitates a different treatment.

The actions of the debtors suggest a concerted effort to defeat the ability of their existing creditors to be paid the monies owed them by maximizing the exemption protections offered under Florida law. Under the *Schwarb* analysis, the court may not permit this manipulation. Thus, the exemption should be denied to the extent that the debtors achieved a benefit greater than their entitlement under Wisconsin law.

■ In this case, had the debtors not engaged in this pre-bankruptcy planning, or had they stayed and filed bankruptcy in Wisconsin, they would have been entitled to an exemption of $40,000 from the proceeds of the sale of their home. Accordingly, the court will allow $40,000 of the Florida home as exempt and will deny the exemption as to the remainder. The Florida home is therefore property of the estate subject to administration, although the trustee will be required to recognize that the amount of $40,000 is the exempt property of the debtors. Pursuant to the provisions of Section 363(f) of the Bankruptcy Code, the trustee may sell the property and distribute the net proceeds, after payment of ordinary and necessary expenses and costs of sale and closing, between the debtors and the estate as determined here. The court has previously utilized this methodology when a debtor has a legitimate homestead claim to some but not all of indivisible property. *See, e.g., In re Wierschem,* 152 B.R. 345, 349 (Bankr.M.D.Fla.1993).

## IV.

### *The Annuity Issue*

■ Mrs. Coplan's annuity presents a slightly different factual and legal analysis. Mrs. Coplan converted funds held in an IRA to an annuity almost one year before the filing of the bankruptcy peti-

tion.[3] The objectors attack Mrs. Coplan's claim of exemption for this annuity because, they argue, it also represents the conversion of non-exempt assets to exempt.

The gravamen of the objectors' objection to Mrs. Coplan's claim of exemption of her annuity is that the IRA account from which it was purchased was fatally defective under the Internal Revenue Code and therefore did not qualify as exempt under Florida law. The defect, the objectors say, stems from the fact that it was funded in part through gifts made to Mrs. Coplan by her parents. The objectors argue that contributions to an IRA from this source invalidate the IRA under the Internal Revenue Code. The objectors argue that, because the IRA was not exempt, the conversion of the funds to an annuity constitutes the kind of impermissible conduct that requires that the exemption be disallowed.

Under Florida law, an annuity is exempt from the bankruptcy estate. *Fla.Stat.* § 222.14. Similarly, Florida law allows the exemption of individual retirement accounts that are qualified as such under the Internal Revenue Code. *Fla.Stat.* § 222.-21(2)(a); *see, In re Horath*, 116 B.R. 835 (Bankr.M.D.Fla.1990). Accordingly, if Mrs. Coplan's IRA account were of the kind approved under Section 401(a), 403(a), 403(b), 408 or 409 of the Internal Revenue Code, there has been no conversion of a non-exempt asset to an exempt asset and the objection to the claim of exemption must be overruled.

Section 408(a) of the Internal Revenue Code sets forth the requirements for an individual retirement account. Specifically, for an account to qualify as an IRA, it must not be transferable by the owner, the premiums may not be fixed, and the annual premium on behalf of the owner may not exceed $2,000. In addition, Section 219(c) of the Internal Revenue Code allows for the establishment of an IRA for the benefit of a non-working spouse. Section 219(c) provides in relevant part that:

(1) IN GENERAL.—In the case of any individual with respect to whom a deduction is otherwise allowable under subsection (a)—

(A) who files a joint return under section 6013 for a taxable year, and

(B) whose spouse—

(i) has no compensation ... for the taxable year ...

there shall be allowed as a deduction any amount paid in cash for the taxable year *by or on behalf of the individual* to an individual retirement plan established for the benefit of his spouse.

(Emphasis added).

The objectors attack the validity of Mrs. Coplan's IRA based upon the source of the funds that went into it. The objectors assert that the words "by or on behalf of the individual" contained in the statute should be construed to require that contributions to an IRA must be made by the working spouse or that spouse's employer. They argue that the contribution may not come from a spouse's parents, as was the case here. The objectors cite no authority for their position save the bare statute.

Should the court adopt the position of the objectors, it would require that, as a predicate to the allowance of a non-working spousal IRA, tracing would be required of all monies used to fund that IRA to establish the origin of those monies. Besides being an unworkable administrative nightmare to the court, it is also clearly incompatible with the legislative purpose in allowing the establishment of an IRA account for a non-working spouse.

More importantly, the rule urged by the objectors would make no sense in practical application. Under the theory advanced by the objectors, the following scenario would result in a valid IRA:

The working spouse earns $25,000 during the year. The couple contributes from the pay checks $2,000 to an IRA for the non-working spouse. The non-working spouse's parents also gift the couple $2,000 that they spend on their regular living expenses.

Yet the following scenario would result in an invalid IRA:

---

**3.** The objectors have not argued the issue of whether Wisconsin law provides for the exemption of either an IRA or an annuity and so the court does not decide that issue.

The working spouse earns $25,000 during the year. The couple uses all of this for regular living expenses. The non-working spouse's parents gift the couple $2,000 that they use for an IRA for the non-working spouse.

In both cases, the couple enjoys the benefit of $27,000, has reportable income of $25,000, and shows on the joint return a $2,000 deduction for the IRA. The fact that the first couple contribute to the IRA from the working spouse's paycheck while spending the gift, whereas the other couple spends their paycheck while funding the IRA from the gift should make no difference in the allowance of the IRA.

In the absence of any contrary authority having been presented to this court, therefore, the court declines to adopt the objectors' position. Mrs. Coplan's IRA account is thus allowable as exempt property. Because Mrs. Coplan's IRA was exempt property, no conversion from non-exempt property occurred when the IRA account was transferred to an annuity. It was merely a conversion from one exempt form to another. Accordingly, the court will overrule the objection to Mrs. Coplan's annuity, and the annuity will be allowed as exempt.

### V.

*Jurisdiction and Conclusion*

The court has jurisdiction of the parties and of the subject matter pursuant to the provisions of 11 U.S.C. §§ 101 *et seq.*, 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the standing order of reference entered by the district court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

Pursuant to the requirements of F.R.B.P. 9021, the court is entering contemporaneously a separate judgment consistent with this decision disallowing the claim of homestead exemption (other than to the extent of $40,000) and allowing the claim of exemption for Mrs. Coplan's annuity.

DONE and ORDERED.