**In re Douglas Lee BANDKAU et ux., Debtors.**

**Bankruptcy No. 94–03819–8C7.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Oct. 18, 1995.

Kevin O'Brien, Tampa, Florida, for Debtors.

Shirley C. Arcuri, Tampa, Florida, for Trustee.

V. John Brook, Trustee, St. Petersburg, Florida.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING EXEMPTION LITIGATION*

C. TIMOTHY CORCORAN, III, Bankruptcy Judge.

This contested matter concerns the debtors' right to a homestead exemption in real estate purchased by the debtors less than ten months before the filing of their Chapter 7 petition. The debtors value the residence at $100,000, and it is encumbered by a mortgage of $35,000 in favor of Community National Bank. The trustee contends that the debtors' down payment of $66,043.59 cash resulting in approximately $65,000 of equity in the residence constitutes a transfer of non-exempt assets to an exempt asset by these debtors with the intent to hinder, delay, or defraud their creditors.

The court finds the following facts by a preponderance of the evidence and makes the following conclusions of law:

## I. Procedural Posture.

On April 20, 1994, the debtors, Douglas Lee Bandkau and Kay Lynn Bandkau, filed a joint petition for relief under Chapter 7 of the United States Bankruptcy Code. V. John Brook is the Chapter 7 trustee of the debtors' estate.

In their bankruptcy schedules, the debtors claimed as exempt their house located at 6411 Silver Oaks Drive, Zephyrhills, Pasco County, Florida, as well as four individual retirement accounts totalling $39,489.04 and other personal property totalling less than $1,000. The trustee filed an objection to the claim of exemptions as to both the homestead and the IRAs, thus initiating this contested matter within the meaning of F.R.B.P. 9014. Before the evidentiary hearing, the trustee withdrew his objection to the IRAs claimed as exempt, leaving for trial the sole issue of the claimed homestead exemption. The court conducted an evidentiary hearing of this matter on July 26, July 27, August 1, and August 3, 1995.

## II. Factual Background.

In August of 1989, the debtors purchased a veterinary practice in Miami known as Crossings Pet Hospital for $110,000 from Dr. Steven Leidner. The debtors bought the veterinary practice as a going concern. In addition to the tangible assets, the sale included client files, good will, and a non-compete agreement with Dr. Leidner. The debtors paid $30,000 in cash and gave an $80,000 promissory note. They also executed a security agreement and a UCC-1 financing statement granting a lien on all furniture, fixtures, and equipment, all medical and other supplies, all accounts receivable, and client files of the veterinary practice. In addition, the debtors gave Dr. Leidner a lien on a 1986 Pontiac. Dr. Leidner, in turn, signed a non-compete agreement that restricted his ability to practice veterinary medicine within a limited geographical area for a specified period of time.

About the same time, the debtors also purchased a home in Miami. They paid $8,176 in cash and gave a mortgage for the remaining part of the purchase price. The house then became their homestead.

After taking over the practice, problems began to develop in the relationship between the debtors and Dr. Leidner. First, in May of 1990, the debtors and Dr. Leidner executed a modification of the non-compete agreement allowing Dr. Leidner to work at a specific animal hospital within the proscribed area on a limited basis. The debtors retained the right to revoke the agreement at any time. This modification was to enable Dr. Leidner to work for one week at a clinic in the area while the owner was on vacation. Two months later, in July of 1990, while Dr. Leidner was filling in for the vacationing veterinarian, he received two letters from Dr. Bandkau asserting a right to a reduction in the $80,000 promissory note to Dr. Leidner because of the modification of the non-compete agreement. Dr. Leidner turned the letters over to his attorney who replied. The Bandkaus then ceased their efforts to obtain a reduction in the promissory note on that basis.

In approximately December of 1991, the Bandkaus decided to move from Miami due to Mrs. Bandkau's allergies. The Bandkaus listed the clinic for sale in February of 1992 and, in July of 1992, received an offer from a Dr. Kim. The Bandkaus approached Dr. Leidner about allowing Dr. Kim to assume the approximately $72,000 remaining due to Dr. Leidner on the note. Dr. Leidner told the Bandkaus that he did not want to incur attorneys fees in having his attorney review the offer. On July 30, 1992, Dr. Bandkau wrote Dr. Leidner and offered to pay up to $300 of Dr. Leidner's legal fees if Dr. Kim purchased the veterinary practice. On August 7, 1992, Dr. Bandkau rescinded his offer to pay Leidner's legal fees.

In late July or early August, attorney Mark Perlman, representing the Bandkaus, contacted Dr. Leidner regarding the Kim offer. Attorney Perlman called Dr. Leidner to request that he release the Bandkaus from the note upon the sale of the veterinary practice. Dr. Leidner refused. Dr. Leidner's testimony was that, when he told attorney Perlman that he would not agree to release the Bandkaus, attorney Perlman responded that Dr. Leidner might as well coop-

erate in the sale to Dr. Kim and release the Bandkaus because he had no choice. If Dr. Leidner did not agree, the Bandkaus could abandon the clinic at any time and file bankruptcy rather than pay Dr. Leidner. Dr. Leidner considered this a threat and was angry about it.

Attorney Perlman's testimony was that he remembers the telephone conversation with Dr. Leidner and that he did not threaten bankruptcy, although attorney Perlman had no notes in his file with regard to the telephone conversation. Attorney Perlman's representation of the Bandkaus terminated on August 18, 1992, according a document in his file.

Attorney Perlman has a general law practice that includes some bankruptcy practice. At the time he represented the Bandkaus, he was familiar with the homestead exemption and the fact that any equity that a debtor has in a homestead would not be available for payment to creditors. Attorney Perlman, therefore, had the knowledge to advise the debtors about bankruptcy and the homestead exemption. Debtors invoked their attorney-client privilege precluding attorney Perlman from testifying as to the matters on which the debtors consulted him.

While Dr. Leidner's and attorney Perlman's recollection of the telephone conversation differs substantially, Dr. Leidner has far more cause to remember the conversation than would attorney Perlman. Attorney Perlman stated that he had no notes of the telephone conversation in his file. Attorney Perlman was unable to testify as to facts clearly documented in his file, such as the dates he represented the Bandkaus, whether he reviewed sale documents, and whether the Bandkaus had signed a contract with Dr. Kim while he represented them.

In fact, attorney Perlman stated that "[t]he only thing I really recall is they [Kim] were going to assume Dr. Leidner's indebtedness and that I was going to be requesting a release of Dr. Bandkau from the Leidner indebtedness from Dr. Leidner."

At trial, Dr. Bandkau had no explanation as to why a release of the debt to Dr. Leidner was so crucial to the Kim offer. Rather,

Dr. Bandkau testified that he and Mrs. Bandkau liquidated $38,000 of stocks and mutual funds in 1992 so that, with the cash down by Dr. Kim, they could pay off the note to Dr. Leidner.

After debtors terminated their relationship with attorney Perlman on August 18, 1992, they consulted attorney Jules "Les" Townsend regarding the Leidner contract.

On August 24, 1992, hurricane Andrew struck Miami causing minimal damage to the veterinary clinic. The Kim offer to purchase the clinic, however, was withdrawn in September, 1992. The debtors collected approximately $8,000 in insurance for business interruption that they deposited in the clinic account in September, 1992, and counted in gross income.

The debtors' home, however, sustained major damage in the hurricane. The debtors moved their home furnishings into storage in Zephyrhills in September, 1992, and lived in the veterinary clinic until February, 1993, when home repairs were completed. The debtors collected insurance proceeds for damage to the home as follows: $5,000 living allowance; $4,250.90 for moving and storage; $36,000 for damage to the real estate; $12,915 for damage to personal property; and $5,603 for a stolen diamond ring. In all, debtors collected $63,768.90 for the home and furnishings and $8,000 for the business. In addition, debtors liquidated $38,743 worth of stock and mutual funds in 1992.

Beginning in January of 1993, Dr. Bandkau wrote a series of letters to Dr. Leidner and others insisting that Dr. Leidner remove the lien on the 1986 Pontiac automobile as it was a "broken-down bucket-of-bolts" and Dr. Bandkau wanted to sell it. Dr. Leidner offered to transfer the lien to another automobile without response. Dr. Bandkau then wrote two letters to Dr. Leidner's mother and a letter to a friend of Dr. Leidner's in California complaining about the situation and criticizing Dr. Leidner. In one letter to Mrs. Leidner, Dr. Bandkau demanded $300 for damage done to a swinging gate at the clinic in August of 1989. In another letter, he demanded $75 from Dr. Leidner to fix a toilet broken in October of 1989. In the letter to Dr. Leidner's friend in California,

Dr. Bandkau makes reference to having his lawyer in Miami look over his contract with Dr. Leidner and calling it "the mother of all contracts." When questioned at trial regarding why he would not simply transfer the lien to another auto, Dr. Bandkau said he intended to lease an auto rather than purchase one.

Finally, Dr. Leidner decided that the harassment by Dr. Bandkau outweighed the value of the lien and that he would release the lien on the auto. When he called Dr. Bandkau to tell him that, Dr. Bandkau replied: "I don't know what you are worried about. I've had your contract reviewed and it is ironclad."

Dr. Bandkau acknowledged saying this and testified that he was referring to the fact that attorney Jules "Les" Townsend had reviewed the contract. Debtors asserted their attorney-client privilege as to their consultation with attorney Townsend.

As soon as Dr. Leidner released the lien on the 1986 Pontiac, Dr. Bandkau by letter of April 9, 1993, offered Dr. Leidner $63,000—a discount—to pay off the note. The letter stated that "[a]fter April 27 this opportunity will be gone for good." Dr. Bandkau testified that the offer was made so that they could sell the clinic without consulting Dr. Leidner. The parties dispute whether the offer was revoked or rejected but agree that nothing came of the offer. Debtors testified that they had money available to pay the approximately $70,000 payoff at that time (with approximately $10,000 left over) and were unable to explain satisfactorily why they did not just pay the balance due when the $63,000 offer did not work out.

In December of 1992, the debtors listed their Miami home for sale. In April, 1993, debtors found a buyer and, on June 7, 1993, the house sold for $73,000, netting them $11,929.37 cash at closing after the mortgage payoff of $55,461.56.

In May, 1993, debtors contracted to purchase a home in Zephyrhills, Florida. On June 11, 1993, debtors completed a uniform residential mortgage loan application for the new home with Community National Bank. The application is a four page document signed by both debtors certifying as follows:

I/we certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on the application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, § 1001 et seq. and liability for monetary damages to the lender, its agents, successors and assigns, insurors and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

The application contains incorrect information in several respects. First, it lists Crossings Pet Hospital as an asset having a net worth of $80,000 which, in fact, was the asking price without deduction of the approximately $70,000 owed to Dr. Leidner. Second, debtors failed to list any liability whatsoever to Dr. Leidner. Third, to the question "are you a co-maker or endorser on a note?" each debtor separately checked "no." Ms. Linda Jones, the loan officer at Community National Bank who handled the loan application, testified that she had no information in her file regarding the debt to Dr. Leidner and that she was "surprised" to learn of the debt at the trial. When questioned at trial, Dr. Bandkau said that Ms. Jones questioned him regarding the asking price of the clinic and Ms. Jones filled in the asking price as the net value. With regard to their failure to list *any* debt to Dr. Leidner, Dr. Bandkau testified he thought the application was asking only for personal—not business related—debts. With regard to checking "no" as to whether they were co-makers on a note, Mrs. Bandkau testified that she thought this referred to an auto loan obligation.

As part of their loan application, the debtors submitted a letter dated May 31, 1993, from a Tampa veterinarian stating that he intended to employ Dr. Bandkau at a salary of $40,000 "as soon as he gets settled in Zephyrhills."

On June 30, 1993, the debtors purchased the Zephyrhills home with a cash down payment and cash at closing totaling $66,043.59 and a mortgage loan of $35,000 from Community National Bank. Mrs. Bandkau had begun living in Zephyrhills part-time in March, 1993, at the home of a relative. After purchase of the Zephyrhills home, she lived there full-time.

Dr. Bandkau testified that they put all their monies with the exception of approximately $7,000 into the down payment on the home to reduce their monthly mortgage payments. The debtors offered no evidence, however, to demonstrate or explain why this was necessary or desirable. Dr. Bandkau was to receive a $40,000 annual salary with the Tampa veterinarian for whom he planned to work in Tampa. Although Mrs. Bandkau did not plan to work outside the home when the debtors settled in Zephyrhills, Dr. Bandkau's salary was to equal or exceed the amount they netted from the Miami veterinary practice.

After putting all the cash into the home, the debtors had no funds to pay off the debt to Dr. Leidner and sell the clinic on installment terms, the debtors' stated purpose in liquidating $38,000 worth of stock in 1992. The debtors later gave the trustee an accounting of the sources of the $64,000 cash at closing. Some $21,000 of the $38,000 in stock proceeds, however, are not accounted for. The debtors were never able to explain this discrepancy.

In July of 1993, Mrs. Bandkau transferred the title to a 1987 Chevrolet Caprice to Dr. Bandkau's father, Stanley Bandkau. Debtors testified that the title to this vehicle was transferred to Mrs. Bandkau in March of 1993 by her grandfather with the understanding that the Bandkaus would pay for the automobile. The Bandkaus, however, made no payment on this vehicle. Debtors' bankruptcy schedules later listed the 1987 Chevrolet Caprice as being sold to Stanley Bandkau in May of 1993 for the blue book value of $4,100. Debtors now admit that the schedules are incorrect and that they did not receive any money on the transfer of the title to Stanley Bandkau. Debtors continue to have possession and use of the Chevrolet Caprice.

On September 15, 1993, debtors consulted bankruptcy attorney Cynthia Chiefa in Miami and paid her a $1,000 retainer. Debtors disclosed this consultation and payment on the statement of affairs filed in their bankruptcy case and indeed listed Ms. Chiefa as a creditor in the bankruptcy case for an additional $1,015.57. Mrs. Bandkau testified that they consulted attorney Chiefa because "they were afraid of losing their home". There is nothing in the record, however, to suggest the debtors were in any financial distress. In September of 1993, the only debt owed was to Dr. Leidner and payments were current. Also, the clinic income from January through August, 1993, exceeded all previous years. The debtors testified that the clinic provided them a good income and that they were satisfied with its financial performance.

On October 1, 1993, Dr. Bandkau began working at a veterinary clinic in Tampa on Mondays and Tuesdays. He therefore cut his hours at Crossings Pet Hospital in Miami from four and one-half days per week to two and one-half days per week. He worked Thursday, Friday, and Saturday mornings in Miami and spent the rest of each week living in Zephyrhills. Dr. Bandkau testified that he obtained employment in Tampa because of a "sudden business downturn" at Crossings Pet Hospital in September of 1993. The income figures from the business, however, show that the veterinary clinic was having its best year ever in the eight months through August, 1993. Moreover, in September, 1993, gross sales for the veterinary clinic were consistent with previous years, as September was historically a slow month.

On October 18, 1993, debtors traded in their 1986 Pontiac that had previously been liened to Dr. Leidner to Heritage Ford and were allowed $3,079.32 as a down payment credit against a 1993 Ford Ranger. The new Ford Ranger was titled in the name of Stanley Bandkau, Dr. Bandkau's father. Debtors produced a receipt from Heritage Ford indicating that the $11,837.35 check for the balance of the purchase price was paid by Stanley Bandkau but did not produce the canceled check. Debtors have had possession

and use of the 1993 Ford Ranger at all times since its purchase.

On November 1, 1993, the debtors failed to pay the monthly payment due to Dr. Leidner. Dr. Leidner tried to contact Dr. Bandkau by telephone, but the debtors did not return his calls.

After Thanksgiving 1993, the debtors closed Crossings Pet Hospital with minimal notice to their clients and no notice to Dr. Leidner. Dr. Bandkau turned over the client files to another veterinarian, Dr. Anderson. Dr. Bandkau first testified at trial on July 27, 1995, that Dr. Anderson paid him $1,500 for the client files. He then testified at trial on August 1, 1995, that he was paid only $375 by check dated January 15, 1994, and made payable to "Stanley Bandkau or Doug Bandkau" jointly. Dr. Bandkau said that he had the check made payable to his father so that he could send it directly to his father without depositing it in his bank account. Later at trial, on August 3, 1995, Dr. Bandkau testified that he had in fact been paid $2,250 by Dr. Anderson, $1,900 of which was made payable to Stanley Bandkau, his father. The debtors did not report the sale of the liened assets, the receipt of payment, or the transfer of monies to Stanley Bandkau on their bankruptcy schedules.

In December of 1993, Dr. Leidner filed suit against the debtors to collect the debt due to him and to foreclose his security interest in the clinic assets, including client files. In January of 1994, the debtors answered and contested the lawsuit, thereby delaying judgment. The debtors testified that, throughout this period, they were hopeful that the matter could be amicably resolved. The debtors, however, made no attempt to contact Dr. Leidner or his attorney in furtherance of settlement.

In January of 1994, debtors consulted with Tampa bankruptcy attorney Michael Barnett and paid him a retainer. Mr. Barnett filed this Chapter 7 bankruptcy case on the debtors' behalf on April 20, 1994.

At the end of March, 1994, the debtors received a $5,000 settlement from a class action lawsuit against the developer of the Country Walk subdivision, the builder of their Miami home. Debtors did not deposit this check into a bank account but rather cashed it. Debtors could provide no specific accounting for these monies. Furthermore, the debtors did not include the receipt of these monies as Income Other Than From Employment or Operation of Business on the debtors' statement of financial affairs. Similarly, the debtors did not disclose the lawsuit.

On approximately April 15, 1994, debtors filed tax returns for 1993 listing IRA contributions of $2,000 each made prior to the tax return filing date.

On April 20, 1994, debtors filed this bankruptcy case with assets consisting of the real estate claimed exempt as homestead; $39,000 of exempt IRAs; $782 of household goods and furnishings; and $350 in a checking account. Dr. Bandkau testified that the debtors' only reason for filing bankruptcy was the debt to Dr. Leidner. Further, he testified that the other, minor debts listed in the bankruptcy were incurred from September to November of 1993.

Dr. Leidner was unable to sell Crossings Pet Hospital as a going concern due to its closure and the removal of the client records. Further, he has been unable to sell the furniture and equipment but has obtained an appraisal of those assets at $2,700. Accordingly, Dr. Leidner has filed a proof of claim in this case for $2,700 as a secured creditor and $76,797.34 as an unsecured creditor.

### III. The Homestead Issue.

■ The relevant exemption statutes are found in Florida law because Florida has opted out of the federal exemptions. 11 U.S.C. § 522(b); § 222.20, *Fla.Stat.*

Article X, Section 4(a)(1), of the Florida Constitution provides that homestead property may be claimed as exempt to its full value and thus may be protected from the reach of creditors. The trustee contends in his objection that the homestead exemption is subject to qualification where the exempt property has been impermissibly converted from non-exempt assets. The applicable reported decisions on this issue in this court are *In re Schwarb*, 150 B.R. 470 (Bankr.M.D.Fla.1992); *In re Coplan*, 156 B.R. 88 (Bankr.M.D.Fla.

1993); and *In re Mackey*, 158 B.R. 509 (Bankr.M.D.Fla.1993). An unreported decision in the same vein is *In re Boyer*, Case No. 93–9156–8G7.

The task of this court is to determine the debtors' intent in liquidating everything of value so that, at the date of filing bankruptcy, their only assets are real estate with a $65,000 equity and $39,000 of IRAs—all claimed as exempt. This court concludes that the debtors' pattern of conduct—including the conversion of non-exempt property to exempt—evidences the specific impermissible purpose of shielding their assets from their one major creditor, Dr. Leidner.

The debtors' testimony as to their benign intent is not credible. The evidence shows that the debtors, as far back as August of 1992, were trying to get a release from the Leidner debt. The debtors consulted at least two attorneys at that time with regard to their debt to Dr. Leidner. Debtors invoked their attorney-client privilege to prevent the trustee from inquiring as to the specific matters on which these attorneys were consulted. Debtors, thereafter, began liquidating their stock with an asserted purpose of paying off Dr. Leidner. Additionally, debtors pressured Dr. Leidner to remove the lien on their automobile until that was accomplished. Finally, the debtors offered $63,000 to settle the Leidner debt but did not pay off the approximately $70,000 debt even though they had the monies to do so. .

Further, debtors' loan application to Community National Bank in June of 1993, prior to the purchase of the claimed "homestead," shows that the debtors at that time had determined that they were never going to pay the debt to Dr. Leidner. This is obvious from the inaccuracies contained in the application. First, the $80,000 net value of the veterinary clinic was the asking price for the clinic not reduced by the debt to Dr. Leidner. Secondly, debtors failed to list as a liability any obligation to Dr. Leidner. Third and most importantly, both debtors denied that they had any note obligation at all. The debtors' explanations for these discrepancies are not believable. Ms. Jones, the bank officer, testified that she had no information in the file regarding the debt to Leidner and she was "surprised" to learn of it.

The debtors then paid $64,000 cash at closing for the Zephyrhills home, leaving them no monies to pay Dr. Leidner and thereby unable to sell the clinic on installment terms without Dr. Leidner's agreement. This was done despite the debtors' earlier assertions that the approximately $38,000 of stock was liquidated to avoid this very situation.

Even after the debtors' purchase of the Zephyrhills home, the debtors continued their pattern of transferring assets out of their names. In July, 1993, Mrs. Bandkau transferred a 1987 Chevrolet Caprice to Dr. Bandkau's father for no consideration. In October, 1993, the debtors traded in a 1986 Pontiac for a 1993 Ford Ranger titled in the name of Dr. Bandkau's father. Debtors still maintain possession and control of both automobiles. Debtors consulted bankruptcy attorneys beginning in September of 1993. Debtors proceeded to abandon the veterinary practice in November of 1993 and to sell liened assets without remitting the monies to Dr. Leidner. Dr. Bandkau testified to three different sales prices for client files on three separate days of this trial. The checks in payment for these client files were made payable to Stanley Bandkau so that the checks would not have to be deposited in the debtors' bank account. The debtors then failed to list on their bankruptcy schedules the sale of these assets, the receipt of these monies, or the transfer of these monies to Stanley Bandkau as they are required to do.

Debtors contested Dr. Leidner's foreclosure, thereby delaying the ultimate entry of judgment, and debtors collected another $5,000 settlement proceeds in late March, 1994. Debtors filed tax returns on approximately April 15, 1994, showing new $2,000 contributions to IRAs for each debtor. Finally, on April 20, 1994, debtors filed their bankruptcy case with assets consisting of the homestead, $39,000 of IRAs, $782 in household goods and furnishings, and $350 in cash. The debtors' receipt of monies and transfer of assets that were revealed at trial were either omitted from their schedules or misstated.

The circumstances of this case make it apparent that the debtors undertook a well considered and carefully orchestrated series of maneuvers for the purpose of shielding their assets from the reach of their creditors. The fact that they had the foresight to begin this process approximately 18 months prior to filing does not change this conclusion.

Having observed the demeanor of the witnesses and having considered the totality of the evidence, the court is convinced that sometime in 1993 the debtors devised a plan to use the bankruptcy process to shed themselves of their obligations to Dr. Leidner while retaining all of their assets as exempt. They began implementing this plan by transferring non-exempt assets to exempt, especially in connection with the purchase of the Zephyrhills home, and by placing assets in the names of relatives.

The scheme developed from a number of factors coming together at the same time. First, the debtors believed that Dr. Leidner had taken advantage of them. They felt he charged them an excessive amount for the veterinary practice and the Crossings Pet Hospital. They thought he took advantage of them by securing their agreement to modify the non-compete agreement without compensation to them. They believed he treated them unfairly in resisting the release of the lien against the automobile. They were displeased at his requirements regarding the sale of the practice to a third party. As a consequence of these events, a personal animosity existed on the part of the debtors toward Dr. Leidner. The degree of animus felt by the debtors is evidenced both by the tone of their earlier communications to Dr. Leidner and his relatives and friends as well as by the later total absence of communication to Dr. Leidner about events with which he was directly involved.

Second, they were frustrated in their desire to move to Zephyrhills by their inability to sell the veterinary practice quickly at a price that would involve no additional cash payment on their part.

Third, Mrs. Bandkau was becoming more and more unhappy living in Miami and her medical condition was worsening. The debtors felt they could no longer wait and sell the

veterinary practice responsibly. They decided simply to walk away from the practice and use the bankruptcy process to walk away from their obligation to Dr. Leidner—their only creditor. They justified this in their own minds by what they considered Dr. Leidner's unfair treatment of them.

The court credits the testimony of Dr. Leidner that attorney Perlman threatened a Bandkau bankruptcy filing as early as the summer of 1992. Although the debtors did not finalize the plan until a year later (about the time of their April 9, 1993, letter to Dr. Leidner), they clearly had all the information they needed to devise their plan as far back as the time of their representation by attorney Perlman.

The evidence further shows that there was no decline in the business of the Crossings Pet Hospital until Dr. Bandkau stopped working there on a full-time basis. The decline in the business was directly caused by Dr. Bandkau's cessation of work there.

When the Bandkaus purchased the Zephyrhills home with substantially all of their non-exempt liquid assets, the overwhelmingly large down payment was not for the purpose of lowering their monthly payments. The evidence produced at trial establish that Dr. Bandkau had a commitment for employment in Tampa for a salary that was equal to or exceeded the debtors' joint earnings from their Miami practice. The large down payment was instead specifically designed to take the money out of the reach of their only creditor, Dr. Leidner, as part of their plan to use the bankruptcy process to shed themselves of their debt to him while retaining all their assets. The structure of the purchase was very different from the structure of the purchase of their Miami home where they paid a small amount down and gave a correspondingly larger mortgage.

The court does not credit the Bandkaus' explanations concerning the transfers of the titles to the 1986 Pontiac and the 1987 Chevrolet Caprice and the disposition of the proceeds from the sale of the mutual funds and stocks. The court does not credit their testimony with regard to the coincidental timing of the filing of the bankruptcy in relation to

the receipt of the $5,000 Country Walk settlement or the filing of their 1994 tax returns and the making of the IRA contributions. The court does not credit their testimony about waiting for Dr. Leidner to settle in early 1994. They never contacted Dr. Leidner to attempt a resolution of their problems because they had already decided to solve the problem through the bankruptcy process and pre-filing conversions of assets. This plan, they thought, would allow them to walk away from the veterinary practice. There is no other credible explanation for the irresponsible way the debtors just shut down that practice.

In determining the debtors' intent, the court must necessarily rely upon all of the objective data available and make inferences based upon the reasonableness of what occurred and the believability of the debtors' explanations. In making these credibility decisions, the court is aided by being able to view the demeanor of the debtors while they testified, including their downcast appearances, the visual communications between the debtors during each's testimony, and Dr. Bandkau's repeated inability to provide specifics in his answers or to respond directly to questions. The debtors are both intelligent and lack no understanding of simple business affairs.

■ The purchase price of the Zephyrhills home was $100,000. The parties do not dispute that this continues to represent the current value of the home. The cash the debtors used to close the transaction included a $2,000 deposit and $64,043.59 cash at closing, for a total of $66,043.59. Of this, the cash proceeds from the sale of their exempt Miami home were $11,929.37. Properly traced proceeds, of course, retain their exempt homestead character.[1] *Orange Brevard Plumbing & Heating Co. v. LaCroix,* 137 So.2d 201, 206 (Fla.1962). Thus, the

court concludes that the debtors converted $54,114.22 of non-exempt assets into an exempt form when they purchased the home ($66,043.59 less $11,929.37 equals $54,114.22).[2] This represents 54.1 percent of the purchase price.

Because the debtors used $54,114.22 of non-exempt assets in purchasing the home with the specific intent to place these assets out of reach of their only creditor, the right to exemption for that portion of the home— 54.1 percent—is forfeited. *Coplan,* 156 B.R. at 92. Accordingly, the court will sustain the trustee's objection to the debtors' claim of exemption for the Zephyrhills home as follows: 54.1 percent of the home is property of the estate subject to administration; 45.9 percent of the home is exempt homestead property of the debtors; and the existing mortgage on the property shall be paid and satisfied first from the debtors' homestead interest.

Pursuant to the provisions of Section 363(f) of the Bankruptcy Code, therefore, the trustee may sell the property and distribute the proceeds as follows:

a. First, pay all ordinary and necessary costs and expenses of sale and closing.

b. Second, divide the remaining proceeds into two shares. One share shall be for the estate and shall consist of 54.1 percent of the remaining proceeds. The other share shall be for the debtors and shall consist of 45.9 percent of the remaining proceeds.

c. Third, pay off and satisfy the existing mortgage on the property held by Community National Bank of Pasco County from the debtors' share. If the debtors' share is insufficient to pay and satisfy the mortgage, the deficiency shall be paid from the estate's share.

---

1. The sale of the Miami home closed on June 7, 1993. The purchase of the Zephyrhills home closed on June 30, 1993. The evidence is sufficient to trace the $11,929.37 of proceeds from the sale of the Miami home into the purchase of the Zephyrhills home.

2. This amount corresponds to the mortgage payoff amount on the Miami home of $55,461.56. Thus, at the June 7, 1993, closing of the sale of

the Miami home, the debtors paid off the $55,461.56 mortgage that encumbered their homestead. Then, at the June 30, 1993, closing on the purchase of their Zephyrhills home, they used $54,114.22 of non-exempt assets to create "exempt" equity in the new homestead that matched—almost exactly—the indebtedness on their former home.

d. Fourth, distribute the remainder of the estate's share to the estate for distribution to creditors and distribute the remainder of the debtors' share, if there is any remaining amount, to the debtors.

### IV. *Jurisdiction and Conclusion.*

The court has jurisdiction of the parties and of the subject matter pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the standing order of reference entered by the district court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

Pursuant to the requirements of F.R.B.P. 9021, the court is entering contemporaneously a separate judgment consistent with this decision.

DONE and ORDERED.