In re Eunice LAZIN, Debtor.

Bankruptcy No. 97–05810–8P7.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

May 19, 1998.

**984**

Scott A. Stichter, Tampa, FL, for debtor.

V. John Brook, St.Petersburg, FL, trustee.

Dennis J. LeVine, Tampa, FL, for trustee.

## ORDER ON TRUSTEE'S OBJECTION TO EXEMPTIONS

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case and the matter under consideration is the Objection to Exemptions claimed by Eunice Lazin (Debtor) filed by the Chapter 7 Trustee, V. John Brooke (Trustee). First Republic Bank filed its Joinder in Objection to Exemptions Filed by Trustee on July 7, 1997. (Doc. 15B). The Objection challenged the Exemption of the Debtor's real property located in Sarasota, Florida; the funds in two NationsBank accounts; and the Debtor's two annuity contracts and/or policies. Initially, a partial Motion for Summary Judgment was filed by the Trustee limited to the Objection to the claimed exemption of the funds maintained by the Debtor in bank accounts with Nations-Bank (Doc. 42A), specifically, Account Nos. 3431334776 (Social Security Account) and 3731821225 (Annuities Account)(collectively the "Bank Accounts"). This Court entered an Order on Trustee's Motion for Summary Judgment on Objection to Exemptions on January 26, 1998, denying the Trustee's Motion for Summary Judgment and entering a partial summary judgment in favor of the Debtor with regard to the exempt status of the funds in the Annuity Account. (Doc. 55). The Court held that the Debtor's right to exempt the funds in the Social Security Account shall be determined at a final evidentiary hearing.

The facts as they appear from the record, through testimony and exhibits offered and admitted into evidence, can be summarized as follows:

On April 11, 1997, the Debtor filed her Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. In due course, the Debtor filed her Statement of Financial Affairs and Schedules. On Schedule C, the Debtor claimed as exempt: (1) a condominium in Sarasota; (2) two annuity contracts and/or policies; and (3) two NationsBank accounts.

The Debtor is a seventy-nine year old widow. Her oldest child is Malcolm Lazin, a non-practicing attorney who managed real property owned by the Debtor, specifically, the Hertz Lot. Pavel Kapic, the Debtor's son-in-law, is a business consultant who assisted the Debtor in her finances.

In 1986, Malcolm Lazin advised the Debtor to purchase a 70,000 square foot lot located along Philadelphia's waterfront, referred to as the Hertz Lot. The Hertz Lot was across the street from a waterside development that Malcolm Lazin's company developed. The Debtor, accepting her son's advice, purchased the Hertz Lot and did not participate in the negotiations for such purchase. Malcolm Lazin, exclusively, participated in the negotiations.

The purchase of the Hertz Lot was financed by two loans. Malcolm Lazin arranged for a first mortgage with Fidelity Bank and a second mortgage with United Jersey Bank. The first mortgage was later assigned to Meridian Bank. The second mortgage with United Jersey loan was subsequently assigned to First Executive Bank (First Executive), First Republic Bank's

(FRB) predecessor. The loans secured by the Hertz Lot had a maturity of twelve months. At maturity, the loans were renewed with the Debtor paying a one percent renewal fee and some pre-paid interest.

For about eight and a half years, the banks were paid from the income produced by the Hertz Lot and from the income produced by the Debtor's portfolio of mutual funds held in her account with Sanford Bernstein, a money manager in New York, (Bernstein account). The payments to the banks, including renewal fees, were about $200,000.00 a year, totalling about $1,700,000.00. The payments were kept current and always renewed.

In early 1996, Meridian Bank was acquired by CoreStates Bank and First Executive was acquired by FRB. It is undisputed that from 1988 through mid–1996 the Debtor had an excellent credit record and had been in good standing with Meridian Bank and First Executive and their respective acquires, CoreStates and FRB.

From 1988 to 1996, Mrs. Lazin funded substantial improvements which were made to the Hertz Lot. However, the Debtor had no involvement with the management of the Hertz Lot. Malcolm Lazin actively managed the Hertz Lot. The Debtor did not have any contact with the banks holding mortgages on the Hertz Lot and never even met a representative of FRB until after she filed bankruptcy.

The Debtor began to experience health problems in the early 1990's. During this time, the Debtor began to have problems with arthritis and she began to experience a hearing loss. Additionally, she was unable to travel much in the 1990's. The Debtor limited her travels to annual trips to visit her relatives and close friends, Hannah and Charles Lazin. Hannah and Charles Lazin initially rented but later purchased a condominium at Gulf & Bay in Sarasota, Florida. The Debtor liked Gulf & Bay and upon returning from her visits, always expressed an interest in moving there.

In 1994, the Debtor had a knee replacement. Due to Philadelphia's weather, the Debtor could not go outside to rehabilitate her knee. Eventually, the Debtor went to Florida and stayed with Charles and Hannah Lazin at Gulf & Bay for several weeks. Upon returning to Philadelphia, and after getting such relief in the warmer climate, the Debtor expressed her interest in permanently moving to Florida.

On December 19, 1995, the Debtor suffered a serious heart attack. Upon her release from the hospital, after two heart operations, the Debtor announced her intention of permanently moving to Florida. Her intention was supported by her doctors' recommendation that she move to a warmer climate. Her children also supported her decision.

In February 1996, the Debtor, with the help of Alyssa Kapic, her daughter, packed up all her possessions, photographs, mementos and clothing and moved to Florida. Additionally, she forwarded all her mail. Immediately upon moving to Florida, the Debtor began to look for a condominium in Gulf & Bay to purchase. A rental at Gulf & Bay would have meant that she could be evicted at any time. The Debtor was interested in purchasing an end unit because they were airier and had more light. These units rarely came on the market but as soon as one did, in September, the Debtor purchased it. The Debtor's closing was in October, 1996.

The family had decided that the condominium would be purchased from funds in the Bernstein account. After the purchase of the condominium, the balance in the Bernstein account would fall below the $400,000.00 minimum account balance required to maintain an account at Bernstein, so, in February 1996 Pavel Kapic began to research investment options. He attended seminars presented by Fidelity Investments (Fidelity) in June 1996. Fidelity sells its own annuity products as well as the annuity products for Canada Life. Pavel Kapic met with Mary–Ellen Cotney, a Fidelity sales representative, after attending the Fidelity seminar in June 1996.

Another consideration in Pavel Kapic's research was that the Debtor needed approximately $4,000.00 per month to cover her living expenses. Prior to the liquidation of

the Bernstein account, the Debtor received this amount of income from Bernstein on a monthly basis. With the reduced principal, the Bernstein account could not have provided the Debtor with the level of income needed without significantly reducing the principal balance over time. The ultimate decision was that the Debtor could no longer use the Bernstein account.

Based on Pavel Kapic's research, it was decided that the balance of the Bernstein account would be used to purchase annuities. The guaranteed payments of annuities would significantly reduce the risk of market fluctuations and provide the Debtor with an almost guaranteed return.

After the purchase of the condominium, the first annuity was purchased with Canada Life in the amount of $150,000.00. This was a fixed annuity which provided her with a guaranteed payment of $2,700.00 per month for the rest of her life. At the same time, the second annuity was purchased for $200,000.00 from Fidelity. This was a variable annuity in which the level of payments depends on the performance of the underlying investments in comparison to the benchmark of 3.5%, the most conservative level, selected by the Debtor. Pavel Kapic testified that the two contracts, when packaged together, provided her with a stable income.

Each of the annuities contained a life insurance feature which provided beneficiaries with payments in the event that the Debtor died within five years of the issuance of the Canada Life annuity or fifteen years of the issuance of the Fidelity annuity. Pavel Kapic's primary focus was the income stream and, according to him, the altering of the death benefits did not affect the income stream.

The second issue the Debtor's family was faced with was the obligations with respect to the Hertz Lot. In January 1996, Malcolm Lazin agreed with the family that he would purchase a fifty percent interest in the Hertz Lot for $1,800,000.00. The offer was based on a $3,600,000.00 valuation. This amount is almost twice the amount owed to the two banks. Malcolm Lazin would pay $180,000.00 down and $10,000.00 a month. The agreement was memorialized in a written document which was circulated among the family. At the time the agreement was entered into, the family believed Malcolm Lazin had the ability to pay. Based on Malcolm Lazin's agreement, the family members, including the Debtor, believed there was no concern as to the banks' repayment.

In general, the CoreStates and FRB loans were renewed on an annual basis. However, that ceased when the loans matured on May 1 and May 31 of 1996. As early as May 17, 1996, Joseph Matisoff, a senior vice president at FRB and the individual responsible for effectuating the repayment of the Debtor's loan, expressly indicated that he would not renew the loan without an amortization schedule and a personal financial statement from the Debtor. On June 10, 1996, FRB mailed the Debtor a computerized past due notice indicating that the Debtor owed the bank $849,310.97 in principal, interest and late charges. At approximately the same time, David E. Fraimow, a vice president at CoreStates, notified Malcolm Lazin that CoreStates would not renew the loan and the full amount, approximately $1,100,000.00, needed to be paid off immediately.

During July and August 1996, Joseph M. Matisoff and his assistant, Fran McGowan, made almost daily phone calls to Malcolm Lazin to inquire about the repayment of the FRB loan. However, Malcolm Lazin was absent from his office at this time due to his recovery from an accident. Finally, in September 1996, FRB sent Malcolm Lazin a letter in which a formal legal demand was made on the Debtor for full payment of the FRB Loan within ninety days. The letter asserted that the Debtor's July 31 and August 31 payments were past due and that "[i]f the delinquency is not cleared ... the Bank may pursue its legal remedies with no further notice." Malcolm Lazin learned that the check for the July payment had been sent and in fact received before the letter was sent. Malcolm Lazin sent a letter to that effect and was of the belief that the default letter was being withdrawn. By letter dated October 2, 1996, FRB agreed that it would withdraw its demand and extend the FRB loan's maturity date to December 31, 1996 with the condition that (1) the Debtor

produce an updated personal financial statement by October 25, 1996; and (2) that all interest payments be brought current and all future payments be made on time. CoreStates continued its parallel pursuit of the Debtor during the summer and fall of 1996.

Since moving to Florida in February 1996, the Debtor has spent substantially all of her time in Gulf & Bay. Her only absences were on account of spending certain religious holidays with her family and to take care of Malcolm Lazin after his accident. However, prior to filing her Petition, the Debtor paid her daughter a year's rent, in advance, for an apartment that is kept for the Debtor to live in when she is in Philadelphia. The apartment is not rented to anyone else nor has it been.

These are the relevant facts which appear from the record and which were presented at the final evidentiary hearing on January 27, 1998, at which the Trustee and First Republic Bank contended that: (1) the Debtor's claimed exemptions should be disallowed as a result of the Debtor's conversion, through the actions of her authorized representatives, of her non-exempt stocks and bonds into annuities and a homestead with the intent to hinder, delay or defraud her creditors; and (2) the condominium is not the Debtor's principal and primary residence.

 It is well established law that it is the objecting party's burden to prove, by a preponderance of the evidence, that the Debtor is not entitled to the exemptions claimed. *In re Miller,* 188 B.R. 302, 307 (Bankr.M.D.Fla.1995)(citing *In re Ehnle,* 124 B.R. 361 (Bankr.M.D.Fla.1991); and *In re Barlock,* 121 B.R. 13 (Bankr.N.D.Ohio 1990)). Once the objecting party has made a prima facie showing, the burden shifts to the Debtor to prove his entitlement to the exemptions. *Miller,* 188 B.R. at 307 (citing *In re Welch,* 115 B.R. 374 (Bankr.M.D.Fla.1990)).

 The difficulty in this particular instance, in addition to the exempt status of the homestead and annuities, is the fact that the Debtor did not participate in any decision making processes concerning the transactions. There is no question that a principal is liable for the authorized actions of his/her

agents and there is no doubt that the principal could be held liable, in this instance, for the conversion of the non-exempt assets into the exempt assets. The fact that the transactions were accomplished by the Debtor's son and son-in-law on her behalf does not shield the Debtor from the conduct of her authorized agents. The property involved in this controversy is homestead and annuities purchased by the Debtor. Whether or not a debtor may forfeit the right to exemptions and lose the constitutional immunity of a homestead has been considered before in the past but the resolution of the homestead issue is not without ambiguity.

One of the claimed exemptions under consideration is the right established by Art. X, Section 4(a) of the Florida Constitution which provides:

### HOMESTEAD EXEMPTION

There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for payment of taxes, and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligation contracted for the house, field or other labor performed on the realty, the following property owned by a natural person[.]

This provision shields the homestead from the claims of creditors and contains only three exceptions, none of which include the conversion of non-exempt property to a homestead. In *Butterworth v. Caggiano,* 605 So.2d 56 (Fla.1992), the Supreme Court of Florida held that "Florida courts have consistently held that the homestead exemption in article X, section 4 must be liberally construed" and the three exceptions must be strictly construed. In *Caggiano,* forfeiture proceedings were not included in the exceptions to the homestead exemption because forfeiture is not mentioned expressly nor by reasonable implication in the three express exceptions.

 This Court has held in the past that the conversion of non-exempt property to exempt property should be permitted with certain limitations. A debtor's claim to exemptions may be denied upon a showing by extrinsic evidence that the debtor converted

non-exempt property into exempt property with the specific intent to defraud his creditors. *Miller*, 188 B.R. at 307 (citing *In re Snape*, 166 B.R. 184, 187 (Bankr.M.D.Fla. 1994)). The majority of cases which have considered the effect of conversion of non-exempt property into exempt property have not involved the Debtor's homestead, but rather tangible or intangible property exempted by Florida Statutes Chapter 222.

There is no question that the homestead exemption fails to provide an exception for real property which has been acquired for the sole purpose of defeating creditor claims. Notwithstanding, the Supreme Court of Florida in *Palm Beach Savings & Loan Ass'n, F.S.A. v. Fishbein*, 619 So.2d 267 (Fla.1993) created a fourth exception to the homestead exemption. In *Fishbein*, the Court held that where non-exempt funds were obtained fraudulently and used to acquire a homestead or to pay off a mortgage on the homestead, the homestead is not immune from the claim of the defrauded creditor.

This Court recently had an opportunity to consider the same in *Miller* and, based on *Caggiano*, concluded that only claims falling within the three express exceptions could be valid and enforceable, even if the homestead was acquired with non-exempt funds with the intent to hinder, delay or defraud creditors. In *Miller*, there was no contention that the debtor used fraudulently obtained funds to acquire the homestead. Thus, this Court refused to apply the fourth exception, created by *Fishbein*, in *Miller*.

To further complicate the issue, the Eleventh Circuit Court of Appeals in *In re Jost*, 136 F.3d 1455 (11th Cir.1998), concluded that this issue is a significant issue under Florida law, it is unresolved by Florida precedents and in a different factual setting it would call for certification to the Supreme Court of Florida. But, because the bankruptcy court did not make a specific finding of whether or not the transactions under consideration were made with the intent to hinder, delay or defraud creditors, the Eleventh Circuit Court of Appeals merely remanded the case to the bankruptcy court to make a specific finding of such. If the bankruptcy court should find that the conversion was with the intent to hinder, delay or defraud creditors, then the court should find that: (1) the equitable circumstances of the case fall within the spirit of the exceptions to the constitutional exemption of homestead property, and thus allow a creditor to enforce a lien against a debtor's homestead under the doctrine of equitable subrogation; or (2) the conversion of non-exempt assets into a homestead with the intent to hinder, delay or defraud creditors is not an express exception to the homestead exemption and thus, the intent to do such has no effect on the homestead exemption.

Be that as it may, until the Supreme Court of Florida determines that equitable considerations may be taken into consideration and recognized as an additional exception to the immunity of the homestead, this Court is inclined to follow its decision in *Miller* and find that the Debtor's homestead is exempt from the claims of her creditors inasmuch as the conversion of non-exempt assets to homestead with the intent to hinder, delay or defraud creditors is not an exception to the homestead exemption. Since there is no contention in the instant case that the Debtor used fraudulently obtained funds to acquire the homestead, the fourth exception created in *Fishbein* is not applicable here. Thus, the Objection to the Debtor's claimed exemption of her homestead should be overruled.

■ The claimed homestead exemption is also challenged by the Trustee and FRB based on the proposition that the Debtor's real permanent residence is not the condominium in Sarasota, Florida, but actually the apartment she rents in Philadelphia. In support of this proposition, the Trustee and FRB point out that the Debtor paid, in advance, one year's rent for the Philadelphia apartment, indicating her desire to permanently reside in the apartment and not in the condominium in Sarasota. While this transaction may be attacked and challenged as a fraudulent transfer, it lacks the persuasiveness to warrant the conclusion that the Debtor is not entitled to claim the condominium as her homestead. This Court is satisfied that the apartment, owned by the daughter in Philadelphia, is not the Debtor's principal residence and this contention must be rejected.

■ This leaves for consideration the Debtor's right to an exemption of the two annuity contracts. There is one significant distinction between the homestead exemption and the exemption created by Statute concerning annuities. This is that the protection granted to homesteads is a constitutionally guaranteed right and lost only if one of the three specific and expressly stated exceptions is present, or fraudulently obtained funds were used.

■ On the other hand, the exemption created for annuities is a creature of the Legislature, with no constitutional protection, and therefore, may be subject to other exceptions, specifically, the exception relating to the fraudulent transfer of non-exempt property into exempt property, whether or not the funds were fraudulently obtained. The Statute which exempts annuities is Florida Statutes Chapter 222.14. This Statute is part of the Chapter which now includes § 222.30. Section 222.30 provides that any conversion of non-exempt assets to exempt assets is a fraudulent asset conversion if the debtor made the conversion with the intent to hinder, delay or defraud the creditor.

■ Exemption laws were designed for honest debtors. *Slatcoff v. Dezen,* 76 So.2d 792 (Fla.1954) (citation omitted). It is generally assumed that the debtor is honest unless and until the contrary is proven. *Id.* In the instant case, the proof presented in support of the challenge to the Debtor's right to exemption of the annuity contracts falls far short of the standard and the facts as established by the record do not warrant a finding that the Debtor's purchase of the two annuity contracts was for the purpose of hindering, delaying and/or defrauding creditors, specifically, the banks. On the contrary, sufficient evidence has been established that the Debtor's purchase of her homestead brought the balance of her Bernstein account below the minimum amount required to maintain the account with Bernstein and thus, the Debtor had to liquidate the entire Bernstein account. The Debtor had been receiving $4,000.00 a month from her Bernstein account and she needed this income to support herself. Because the Debtor could no longer maintain her Bernstein account, she needed to find an alternative means of investment to produce this income. After research, Pavel Kapic determined that annuities would provide the Debtor with the monthly income she needed. This being the case, the challenge to the Debtor's right to the annuities exemption should be overruled.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Objection to Exemptions filed by the Chapter 7 Trustee, V. John Brooke and First Republic Bank's Joinder in Objection to Exemptions be, and the same are hereby, overruled inasmuch as the Debtor, Eunice Lazin, is entitled to her homestead in Sarasota, Florida and the two annuity contracts as exempt.