In re JOHN RICHARDS HOMES
BUILDING CO., L.L.C.,
Debtor.

No. 02–54689–R.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Sept. 17, 2003.

Norman C. Ankers, Honigman Miller Schwartz and Cohn, Detroit, MI, for Debtor.

Ralph E. McDowell, Bodman, Longley, Detroit, MI, for Petitioning Creditors.

### Opinion Regarding JRH's Motion for Miscellaneous Post– Judgment Relief

STEVEN W. RHODES, Chief Judge.

On April 25, 2003, the Court entered a judgment in favor of the alleged debtor, John Richards Homes Building Company, L.L.C., ("JRH") against the petitioning creditor, Kevin Adell, in the amount of $6,413,230.68 pursuant to 11 U.S.C. § 303(i). *See In re John Richards Homes Bldg. Co., L.L.C.*, 291 B.R. 727 (Bankr. E.D.Mich.2003). Very shortly thereafter, Adell liquidated his assets in Michigan to purchase a $2.8 million home in Florida. Specifically, on May 5, 2003, Adell sold nine luxury and classic vehicles for $536,000. On the same day, he cashed in $1.7 million in United States Treasury bills. He also withdrew $300,000 from his account at Standard Federal Bank. Finally, Adell's father approved a $300,000 loan from his corporations, where Adell is employed. Adell signed the purchase agreement for the home on May 6, 2003, and closed on the purchase of the home on May 8, 2003.

On May 21, 2003, JRH filed this motion for miscellaneous post-judgment relief, seeking the aid of the Court to collect on its judgment. Specifically, JRH asserts that because Adell used the proceeds of his Michigan assets to purchase the Florida home immediately after the judgment was entered, Adell should be ordered to sell that home and remit the proceeds in partial satisfaction of the judgment. Also,

JRH requests an order requiring Adell to turn over certain personal property to the United States Marshal. Finally, JRH seeks an order requiring the Michigan Secretary of State to record liens on several specified vehicles in favor of JRH.

Adell opposes the relief sought by JRH. Specifically, he argues that his Florida home is protected by Florida's homestead exemption, that JRH should employ the established procedures under state law to execute on personal property and that he no longer owns any vehicles on which the Michigan Secretary of State can record liens.

In reply, JRH asserts that in the unique circumstances of this case, 11 U.S.C. § 303(i) preempts the Florida homestead law and that in any event, because Adell is not a Florida resident, he cannot properly claim the Florida homestead exemption.

The Court conducted an evidentiary hearing, in part, to determine whether Adell is entitled to claim the Florida homestead exemption. The Court now concludes that in this case 11 U.S.C. § 303(i) does preempt the Florida homestead law. In the alternative, the Court concludes that Adell is not a Florida resident entitled to claim this exemption. Accordingly, the Court concludes that JRH is entitled to the relief that it seeks. In addition, under M.C.L. § 600.6104(5), the Court concludes that with certain exceptions, JRH is entitled to the turnover order that it seeks, as well as an order requiring the Michigan Secretary of State to record liens in favor of JRH on vehicles still titled in Adell's name.

## I.

When the bankruptcy court dismisses an involuntary petition, 11 U.S.C. § 303(i) permits the court to enter a judgment against the petitioner and in favor of the alleged debtor for costs and attorney fees.

In addition, if the court finds the petition was filed in bad faith, the court can award compensatory and punitive damages.

The narrow question raised in this case is whether a Michigan resident, who files an involuntary petition in bad faith and against whom a substantial judgment has been entered under § 303(i), can avoid the effect of that judgment by subsequently liquidating his Michigan assets and purchasing a home in a state with an unlimited homestead exemption. In this case, Adell contends that he can; JRH asserts otherwise.

The Court concludes that in enacting 11 U.S.C. § 303(i), Congress must have intended that a judgment under 11 U.S.C. § 303(i) would give the alleged debtor an opportunity for a real remedy for its losses and thus something more than a one-way ticket to Florida for the petitioner. Accordingly, in this case, the Court concludes that 11 U.S.C. § 303(i) preempts the Florida homestead law and that therefore JRH is entitled to the relief it seeks as to Adell's new home in Florida.

The Court will first review the most recent Supreme Court precedent on the general application of the preemption doctrine. Then the Court will review the Supreme Court and Sixth Circuit bankruptcy precedents that have applied the preemption doctrine. The Court will then examine cases holding that 11 U.S.C. § 303(i) preempts other state laws, as well as other cases holding that other federal laws preempt state homestead laws. Finally, the Court will apply these precedents to this case and explain why 11 U.S.C § 303(i) preempts the Florida homestead law in this case.

## A.

The Supreme Court summarized the operation of the Supremacy Clause of the

Constitution in *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 30, 116 S.Ct. 1103, 1107, 134 L.Ed.2d 237 (1996):

> This question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state, law. U.S. Const., Art. VI, cl. 2; *see California Fed. Sav. & Loan Assn. v. Guerra,* 479 U.S. 272, 280–281, 107 S.Ct. 683, 689–690, 93 L.Ed.2d 613 (1987) (reviewing pre-emption doctrine).

Sometimes courts, when facing the pre-emption question, find language in the federal statute that reveals an explicit congressional intent to pre-empt state law. *E.g., Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 530–531, 97 S.Ct. 1305, 1309–1310, 1312–1313, 51 L.Ed.2d 604 (1977). More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the federal statute's "structure and purpose," or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent. *Id.,* at 525, 97 S.Ct. at 1309–1310; *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). A federal statute, for example, may create a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Alternatively, federal law may be in "irreconcilable conflict" with state law. *Rice v. Norman Williams Co.,* 458 U.S. 654, 659, 102 S.Ct. 3294, 3298–3299, 73 L.Ed.2d 1042 (1982). Compliance with both statutes, for example, may be a "physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248 (1963); or, the state law may "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

*Id.,* 517 U.S. at 30–31, 116 S.Ct. at 1107–08. *See also Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 137–38, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990) ("[T]he question whether a certain state action is pre-empted by federal law is one of congressional intent." (internal quotation marks and citation omitted)); *FMC Corp. v. Holliday,* 498 U.S. 52, 56, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990) ("In determining whether federal law pre-empts a state statute, we look to congressional intent.").

Moreover, the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) is particularly applicable in this case because part of this Court's judgment against Adell was for JRH's attorney fees. In *Alyeska Pipeline,* the Supreme Court reversed an award of fees based on the court of appeals' equitable power. Although not grounded in the doctrine of preemption, the decision is significant in the present case because the Supreme Court stressed the authority of Congress to regulate attorney fee awards in the federal courts. The Supreme Court stated:

> What Congress has done, however, while fully recognizing and accepting the [American] rule, is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights.... Under this scheme of things,

it is apparent that *the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine.*

*Id.* at 260–62, 95 S.Ct. at 1623–24 (citations and footnotes omitted) (emphasis added). *See also Taylor v. Freeland & Kronz,* 503 U.S. 638, 645–46, 112 S.Ct. 1644, 1648–49, 118 L.Ed.2d 280 (1992) (To the extent that existing federal remedies do not deter bad-faith behavior in bankruptcy proceedings, "*Congress* may enact comparable provisions" to address the difficulties.) (emphasis added).

### B.

Both the Supreme Court and the Sixth Circuit have decided cases addressing whether the Bankruptcy Code preempts state laws.

For example, in *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), an unpaid judgment resulted in the suspension of the debtor's driving privileges under the Arizona Motor Vehicle Safety Responsibility Act, even though the judgment debt had been discharged in bankruptcy. In beginning its analysis of the preemption question, the Supreme Court stated, "Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." *Id.* at 644, 91 S.Ct. at 1708. After thoroughly reviewing purposes and effects of both the state law and the bankruptcy discharge, the Supreme Court held that the Arizona act was preempted by the bankruptcy laws and was therefore unconstitutional. The Court concluded, "[A]ny state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Id.* at

652, 91 S.Ct. at 1712. The Court also stated:

Three decades ago Mr. Justice Black, after reviewing the precedents, wrote in a similar vein that, while '(t)his Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, ha(d) made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference(,) * * * (i)n the final analysis,' *our function is to determine whether a challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'* *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Since *Hines* the Court has frequently adhered to this articulation of the meaning of the Supremacy Clause. *See, e.g., Nash v. Florida Industrial Comm'n,* 389 U.S. 235, 240, 88 S.Ct. 362, 366, 19 L.Ed.2d 438 (1967); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 229, 84 S.Ct. 784, 787, 11 L.Ed.2d 661 (1964); *Colorado Anti–Discrimination Comm'n v. Continental Air Lines, Inc.,* 372 U.S. 714, 722, 83 S.Ct. 1022, 1026, 10 L.Ed.2d 84 (1963) (dictum); *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962); *Hill v. Florida,* 325 U.S. 538, 542–543, 65 S.Ct. 1373, 1375—1376, 89 L.Ed. 1782 (1945); *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942). Indeed, in *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), a recent case in which the Court was closely divided, all nine Justices accepted the *Hines* test. *Id.,* at 141, 83 S.Ct., at 1217 (opinion of the

Court), 83 S.Ct. at 1229 (dissenting opinion).

*Id.* at 649–50, 91 S.Ct. at 1711 (emphasis added).

In *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), the Supreme Court addressed whether Congress, in enacting the bankruptcy laws, had intended to create a uniform federal law of property and thereby to preempt state property laws. The Supreme Court held, however, that state property law, rather than federal law, did apply in bankruptcy because "Congress has not chosen to exercise its power to fashion any such rule." *Id.,* 440 U.S. at 54, 99 S.Ct. at 917. Quoting from *Stellwagen v. Clum,* 245 U.S. 605, 613, 38 S.Ct. 215, 217, 62 L.Ed. 507, the Supreme Court stated:

> The Federal Constitution, Article I, § 8, gives Congress the power to establish uniform laws on the subject of bankruptcy throughout the United States. In view of this grant of authority to the Congress it has been settled from an early date that state laws to the extent that they conflict with the laws of Congress, enacted under its constitutional authority, on the subject of bankruptcies are suspended. While this is true, state laws are thus suspended only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress. *Sturges v. Crowninshield,* 4 Wheat. 122, 4 L.Ed. 529; *Ogden v. Saunders,* 12 Wheat. 213, 6 L.Ed. 606.

*Id.* at 54, 99 S.Ct. at 918, n. 9 (internal quotation marks and citation omitted). *See also Int'l Shoe Co. v. Pinkus,* 278 U.S. 261, 265, 49 S.Ct. 108, 110, 73 L.Ed. 318 (1929).

The Sixth Circuit recently decided a case involving a claim that the bankruptcy laws preempt state law. In *Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417 (6th Cir.2000), the debtors asserted a violation of the bankruptcy discharge injunction and sought state law unjust enrichment and accounting remedies. Initially, the court reviewed the standards for determining the preemption issue:

> In *Bibbo v. Dean Witter Reynolds, Inc.,* 151 F.3d 559 (6th Cir.1998), we described the three different types of preemption of state law by federal law under the Supremacy Clause, U.S. Const. art. VI:(1) express preemption, which occurs when Congress expresses an intent to preempt state law in the language of the statute; (2) field preemption, where Congress intends fully to occupy a field of regulation; and (3) conflict preemption, "where it is impossible to comply with both federal and state law, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 562–63.

*Id.* at 425.

The Sixth Circuit concluded, "Permitting assertion of a host of state law causes of action to redress wrongs under the Bankruptcy Code would undermine the uniformity the Code endeavors to preserve and would 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Bibbo,* 151 F.3d at 562–63." *Id.* at 426 (alteration in original). Thus, the court found that the federal bankruptcy laws did preempt the state law remedies sought by the debtors.

On the other hand, in *Storer v. French (In re Storer),* 58 F.3d 1125, 1128 (6th Cir.1995), the Sixth Circuit held that the bankruptcy laws did not preempt the Ohio law establishing exemptions in bankruptcy, because in 11 U.S.C. § 522(b)(1), Congress explicitly granted states the authority to regulate the bankruptcy exemptions that a debtor can claim. *See also Rhodes v. Stewart,* 705 F.2d 159, 163 (6th Cir.1983).

### C.

11 U.S.C. § 303(i) is almost uniformly held to preempt a debtor's state law claims against petitioning creditors after an involuntary bankruptcy petition is dismissed. *See, e.g., Susman v. Schmid (In re Reid)*, 854 F.2d 156, 162 (7th Cir.1988) (attorney fee claim); *Miles v. Okun (In re Miles)*, 294 B.R. 756, 759–60 (9th Cir. BAP 2003) (defamation, abuse of process, emotional distress, negligence); *Glannon v. Garrett & Assoc., Inc.*, 261 B.R. 259, 263 (D.Kan. 2001) (abuse of process); *Koffman v. Osteoimplant Tech., Inc.*, 182 B.R. 115, 125 (D.Md.1995) (abuse of process and malicious prosecution); *Mason v. Smith*, 140 N.H. 696, 672 A.2d 705, 708 (1996) (wrongful filing); *Raymark Ind., Inc. v. Baron*, 1997 WL 359333 (E.D.Pa.1997) (wrongful use of civil proceedings, abuse of process, tortious interference with contractual business relations, civil conspiracy and attorneys' fees); *Sarno v. Thermen*, 239 Ill. App.3d 1034, 180 Ill.Dec. 889, 608 N.E.2d 11, 15–18 (1992) (conspiracy); *Gene R. Smith Corp. v. Terry's Tractor, Inc.*, 209 Cal.App.3d 951, 257 Cal.Rptr. 598, 599–600 (1989) (abuse of process and malicious prosecution).

The only case to the contrary appears to be *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 51 (3d Cir.1988). However, as *Mason* pointed out, *Paradise Hotel* should be limited to its unique facts:

> The court in *Paradise Hotel* allowed the plaintiff to proceed on its tort claims based on the wrongful filing of an involuntary chapter 7 bankruptcy petition. *Id.* at 52. The holding in that case, however, was limited to situations in which the plaintiff has converted to, or independently petitioned for relief under, chapter 11. *Id.* The court reasoned that treating section 303(i)(2) as an exclusive remedy in those situations would

penalize a debtor "for exercising its statutory right to convert promptly." *Id.*

*Mason*, 672 A.2d at 708. *See also Sarno*, 180 Ill.Dec. 889, 608 N.E.2d at 16–17; *Raymark* at *10.

These cases rely on five grounds for the conclusion that § 303(i) preempts state remedies.

The primary basis was stated in *Koffman*. "Allowing state tort actions based on allegedly bad faith bankruptcy fillings [sic] or violations of the automatic stay to go forward ultimately would have the effect of permitting state law standards to modify the incentive structure of the Bankruptcy Code and its remedial scheme." 182 B.R. at 125. *See also Raymark* at *10. This is simply another way of stating that these state tort remedies "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67, 61 S.Ct. at 403; *Pertuso*, 233 F.3d at 426.

Second, the federal district courts have *exclusive* jurisdiction over bankruptcy cases under 28 U.S.C. § 1334(a). *Mason*, 672 A.2d at 708 ("We acknowledge that preemption of state law remedies for the wrongful filing of an involuntary petition conflicts with the traditional authority of States to provide tort remedies to their citizens.") (citing *Koffman*, 182 B.R. at 125; *Gene R. Smith Corp.*, 257 Cal.Rptr. at 600); *Raymark* at *10.

Third, the bankruptcy courts need full control over the remedies available for improper process in the cases on its docket. In *Miles*, the panel stated, "The risk of subverting the bankruptcy process also warrants the conclusion that bankruptcy courts must have control over remedies for the improper filing of bankruptcy petitions[.]" 294 B.R. at 760.

Fourth, the constitution requires "uniformity" in the laws of bankruptcy. In *Miles,* the panel stated, " 'the unique, historical, and even constitutional need for uniformity in the administration of the bankruptcy law' signaled Congressional intent to preempt the regulation of parties appearing in bankruptcy[.]" *Id.* at 760 (quoting *MSR Exploration, Ltd. v. Meridian Oil, Inc.,* 74 F.3d 910, 915 (9th Cir. 1996)). *See also Koffman,* 182 B.R. at 125; *Mason,* 672 A.2d at 707–08; *Raymark* at *10.

Fifth, the cases identify a concern that allowing state law remedies for improper filings would discourage creditors from invoking the bankruptcy process. *See Miles,* 294 B.R. at 760 ("There is a palpable federal interest in foreclosing the possibility that debtors or third parties opposed to the bankruptcy would attempt to interrupt or chill legitimate bankruptcy cases by pursuing satellite state tort litigation as a form of collateral attack on the bankruptcy petition."); *Glannon,* 261 B.R. at 265; *Koffman,* 182 B.R. at 126; *Gene R. Smith Corp.,* 257 Cal.Rptr. at 600; *Mason,* 672 A.2d at 708.

## D.

In the context of voluntary bankruptcy filings, other cases have similarly held that state law abuse of process claims are also preempted. For example, in *Gonzales v. Parks,* 830 F.2d 1033 (9th Cir.1987), the Ninth Circuit held that a creditor's state court claim that the debtor's bankruptcy petition was an abuse of process was preempted. The court stated, "[I]t is for Congress and the federal courts, not the state courts, to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process and when those incentives or penalties shall be utilized." *Id.* at 1036.

In *MSR Exploration,* 74 F.3d at 916, the Ninth Circuit held that federal law preempted a voluntary debtor's state malicious prosecution claim against a creditor relating to the creditor's bankruptcy pleadings. In so concluding, the court relied on the same principles that motivated the courts' holdings regarding preemption in the involuntary bankruptcy context: exclusive federal court jurisdiction over bankruptcy cases; the manifest Congressional "intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike[,]" *id.* at 914; the Constitutional mandate for uniformity in bankruptcy; and the potential for chilling creditors' rights.

*See also Edmonds v. Lawrence Nat. Bank & Trust Co., N.A.,* 16 Kan.App.2d 331, 823 P.2d 219 (1991) (The Bankruptcy Code preempts the debtor's abuse of process claim relating to the defendant's filing of an adversary proceeding.); *Idell v. Goodman,* 224 Cal.App.3d 262, 273 Cal. Rptr. 605 (1990).

## E.

Finally, several cases have held that there is nothing about state homestead laws that commands special protection from preemption by applicable federal laws. Most commonly, this has been addressed in the application of the federal drug forfeiture law, 21 U.S.C. § 881(a)(7), to preempt the Florida homestead law. *See, e.g., United States v. Lot 5, Fox Grove,* 23 F.3d 359, 362 (11th Cir.1994); *United States v. 212 Airport Rd. S.,* 771 F.Supp. 1214, 1215–16 (S.D.Fla.1991); *Brewer v. United States (In re Brewer),* 209 B.R. 575, 577 (Bankr.S.D.Fla.1996).

Similarly, the homestead laws of other states are preempted by 21 U.S.C. § 881(a)(7). *See United States v. Wagoner*

*County Real Estate,* 278 F.3d 1091, 1097 (10th Cir.2002) (Oklahoma homestead law); *United States v. Curtis,* 965 F.2d 610, 616 (8th Cir.1992) (Iowa homestead law); *United States v. Lot 85,* 894 F.Supp. 397, 405 (D.Kan.1995) (Kansas homestead law); *United States v. 1606 Butterfield Rd.,* 786 F.Supp. 1497, 1503–05 (N.D.Iowa 1991) (Iowa homestead law).

The Florida homestead law is also preempted by 18 U.S.C. § 1955(d), relating to gambling forfeiture. *United States v. 18755 North Bay Rd.,* 13 F.3d 1493, 1498 (11th Cir.1994).

In *Lot 5,* the Eleventh Circuit began by analyzing the breadth of the Florida homestead law. "In Article X, § 4, the Florida Constitution provides that homesteads are exempt from forced sale. The Florida Supreme Court has interpreted this provision to forbid civil or criminal forfeiture of homestead property." *Id.* at 362 (footnote omitted). The court then examined 18 U.S.C. § 881(a)(7). "For its part, § 881(a)(7) provides for forfeiture of real property, and by making no allowances for property protected by state law, we infer that Congress intended § 881(a)(7) to be read broadly. Simply put, § 881(a)(7) states that *all* real property, without limitation or qualification, is subject to forfeiture." *Id.* at 363 (footnotes omitted) (emphasis in original). After then reviewing the legislative history of § 881(a)(7) to the same effect, the court readily concluded, "Thus, § 881(a)(7) conflicts with Article X, § 4 of the Florida Constitution. Indeed, to carve out an exception for homestead under federal law would negate the plain meaning of § 881(a)(7) and frustrate its purpose." *Id.* (footnote omitted).

*See also Curtis,* 965 F.2d at 616–17 ("[T]he federal forfeiture statute, § 853(a), clearly superseded the homestead exemption set forth in Iowa Code §§ 561.16. To hold differently would virtually destroy the uniformity of application of § 853(a) and would interfere with the intent of Congress."); *212 Airport Rd.,* 771 F.Supp. at 1216 ("[T]here is direct conflict between federal and state law here."); *Brewer,* 209 B.R. at 577 ("[F]ederal forfeiture law, as an act of supremacy, preempts the homestead exemption provision found in Article X, Section 4 of the Florida Constitution, because the latter directly conflicts and interferes with the objectives of Congress.") (footnotes and citations omitted); *Wagoner County Real Estate,* 278 F.3d at 1097.

Significantly, these cases conclude that even when the state law explicitly protects a homestead against forfeiture, it is preempted by applicable federal law. *Wagoner County Real Estate,* 278 F.3d at 1096–97; *Lot 85,* 894 F.Supp. at 405; *1606 Butterfield Rd.,* 786 F.Supp. at 1504; *18755 North Bay Rd.,* 13 F.3d at 1497.

### F.

Before applying the holdings of these authorities in this case, it is important to recall the narrow issue before the Court. There is no cause in this case to consider generally whether 11 U.S.C. § 303(i) preempts state exemption laws. Rather the issue raised in this case is much narrower: In providing a remedy for a business that was substantially and demonstrably injured by an involuntary bankruptcy petition that was filed in bad faith, did Congress intend to allow a Michigan resident, who filed that involuntary petition in a bankruptcy court in Michigan and against whom a § 303(i) judgment has been entered, to then transfer his otherwise non-exempt assets to another state to take advantage of more liberal exemptions? Under the applicable authorities previously reviewed, the analysis is straightforward and the result clear.

■ *Barnett Bank* instructs to begin the analysis by determining whether there is "language in the federal statute that reveals an explicit congressional intent to pre-empt state law." *Barnett Bank,* 517 U.S. at 30, 116 S.Ct. at 1107. In the context of the Bankruptcy Code, it must be concluded that there is no such explicit language.

■ In this event, *Barnett Bank* instructs that the question then becomes "whether the federal statute's 'structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent." *Barnett Bank,* 517 U.S. at 30, 116 S.Ct. at 1107. On this point *Barnett Bank* identifies distinct circumstances in which to infer that Congress intended to preempt state law. The first is where the scheme of federal regulation is pervasive. *Id. See also Rice v. Santa Fe Elevator Co.,* 331 U.S. 218, 230, 67 S.Ct. 1146 (1947); *Pertuso,* 233 F.3d at 425. Alternatively, there may be an irreconcilable conflict between the state and federal laws or the state law may stand as an obstacle to the accomplishment of the full purposes and objectives of Congress. *Barnett Bank,* 517 U.S. at 30, 116 S.Ct. at 1108; *Hines,* 312 U.S. at 67, 61 S.Ct. at 404; *Pertuso,* 233 F.3d at 425–26.

The Court will address each of these alternatives in turn.

### G.

Virtually every case addressing preemption by the Bankruptcy Code found that its regulation of the field is pervasive. As noted above, the Bankruptcy Code was enacted pursuant to the authority that the Constitution grants to Congress to enact "uniform laws on the subject of Bankruptcies." Art. I, § 8, cl. 4; *Perez v. Campbell,* 402 U.S. 637, 654, 91 S.Ct. 1704, 1713, 29 L.Ed.2d 233 (1971); *Hood v. Tenn. Stu-dent Assistance Corp. (In re Hood),* 319 F.3d 755 (6th Cir.2003).

■ The Supreme Court "has long recognized that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period[.]'" *Katchen v. Landy,* 382 U.S. 323, 328–29, 86 S.Ct. 467, 472, 15 L.Ed.2d 391 (1966) (quoting *In re Christy,* 3 How. 292, 312, 11 L.Ed. 603 (1845)). In addition, "historically one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another." *Young v. Higbee,* 324 U.S. 204, 210, 65 S.Ct. 594, 597, 89 L.Ed. 890 (1945) (footnote omitted).

Regarding the Bankruptcy Code, the Ninth Circuit observed:

"[A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike. While it is true that bankruptcy law makes reference to state law at many points, the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal. It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process."

*MSR Exploration, Ltd. v. Meridian Oil, Inc.,* 74 F.3d at 914 (footnote omitted).

Echoing this observation, the Sixth Circuit recently stated:

Several factors highlight the exclusively federal nature of bankruptcy proceed-

ings. The Constitution grants Congress the authority to establish "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, § 8. Congress has wielded this power by creating comprehensive regulations on the subject and by vesting exclusive jurisdiction over bankruptcy matters in the federal district courts. 28 U.S.C. § 1334(a). The pervasive nature of Congress' bankruptcy regulation can be seen just by glancing at the Code[.]

*Pertuso,* 233 F.3d at 425.

■ Indeed, because the pervasive nature of the Bankruptcy Code extends to involuntary bankruptcy cases and, more specifically, to the remedies for improperly filed involuntary cases, § 303(i) is held to preempt state regulation. See Part I.C., above. In its comprehensive and pervasive regulation of the remedies available for an improperly filed involuntary bankruptcy petition, Congress certainly could have provided exemptions for a petitioner such as Adell, but apparently chose otherwise. That choice does not open the door for state regulation; rather, it is a choice that the courts must respect and enforce. *See Int'l Shoe Co. v. Pinkus,* 278 U.S. at 265, 49 S.Ct. at 110 ("States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations.").

Indeed, preventing the very kind of outrageous conduct seen in this case—moving property to avoid debt—may well be at the heart of the constitutional uniformity requirement in bankruptcy and of the enactments of Congress pursuant to that authority. Relying on historical sources, *MSR Exploration* explained:

At a time when each grant of power to the federal government was often looked upon with a degree of suspicion, Madison, while engaging in a lengthy defense of various grants that might seem obvi-

ous today, was able to refer to the bankruptcy provision rather tersely:

The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.

*The Federalist* No. 42, at 308 (James Madison) (Benjamin Fletcher Wright ed., 1961). Justice Story was of the same opinion. He indicated that the reasons for conferring the bankruptcy power upon the United States:

result from the importance of preserving harmony, promoting justice, and securing equality of rights and remedies among the citizens of all the states. It is obvious, that if the power is exclusively vested in the states, each one will be at liberty to frame such a system of legislation upon the subject of bankruptcy and insolvency, as best suits its own local interests and pursuits. Under such circumstances no uniformity of system or operations can be expected.... There can be no other adequate remedy than giving a power to the general government to introduce and perpetuate a uniform system.

2 Joseph Story, Commentaries on the Constitution of the United States § 1107 (2d ed. 1851).

*MSR Exploration,* 74 F.3d at 914–15.

### H.

■ The Court must further conclude that in the context of this case, Florida's homestead law stands as an obstacle to accomplishing the purposes of Congress in enacting § 303(i). In demonstrating this, the Court will follow the analysis of *Perez*

in reviewing first the interpretation and effect of the state law, and then the purpose of the federal law.

### 1.

Article X, § 4(a)(1) of the Florida Constitution provides in pertinent part:

> There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:
>
> (1) a homestead....

Art X, § 4(a)(1), Fla. Const.

This exemption was authoritatively addressed by the Florida Supreme Court in *Havoco of Am., Ltd. v. Hill,* 790 So.2d 1018 (Fla.2001). In that case, the court answered a question certified from the Eleventh Circuit and concluded that the Florida homestead law protects a homestead even if the debtor obtained it using nonexempt assets with the intent to hinder, delay, or defraud creditors. The court began:

> This Court has long emphasized that the homestead exemption is to be liberally construed in the interest of protecting the family home. *See, e.g., Milton v. Milton,* 63 Fla. 533, 58 So. 718, 719 (1912).... However, in the same breath we have similarly cautioned that the exemption is not to be so liberally construed as to make it an instrument of fraud or imposition upon creditors[.]... While we are certainly loathe to provide constitutional sanction to the conduct alleged by the petitioner and implicated by the certified question, this Court is

powerless to depart from the plain language of article X, section 4.

*Id.* at 1020 (footnotes omitted).

The court then noted that its own prior decisions had uniformly protected the homestead against state forfeiture proceedings, on the grounds that the constitutional provision had three exceptions, but none for forfeiture. *Butterworth v. Caggiano,* 605 So.2d 56 (Fla.1992). *See also Tramel v. Stewart,* 697 So.2d 821 (Fla. 1997).

The court also discussed and relied on several cases from other courts holding that the Florida homestead provision contained no exception for property obtained to avoid a judgment. *Bank Leumi Trust Co. v. Lang,* 898 F.Supp. 883 (S.D.Fla. 1995) (Debtors moved from New Jersey to avoid a New Jersey judgment on personal guaranties); *In re Young,* 235 B.R. 666 (Bankr.M.D.Fla.1999) (Debtor moved from Illinois allegedly to avoid marital obligations); *In re Hendricks,* 237 B.R. 821 (Bankr.M.D.Fla.1999) (Debtor moved from California to avoid a state court judgment); *In re Lazin,* 221 B.R. 982 (Bankr.M.D.Fla. 1998) (Debtors fraudulently converted nonexempt property in Pennsylvania to exempt homestead in Florida); *In re Clements,* 194 B.R. 923 (Bankr.M.D.Fla.1996) (Debtor moved from Alabama with intent to defraud creditors); *In re Lane,* 190 B.R. 125 (Bankr.S.D.Fla.1995); *In re Popek,* 188 B.R. 701 (Bankr.S.D.Fla.1995) (Debtor purchased Florida homestead to avoid Florida state court judgment).

The *Havoco* court then distinguished its prior decision in *Palm Beach Sav. & Loan Ass'n v. Fishbein,* 619 So.2d 267 (Fla. 1993). In that case the defendant used the proceeds of a fraud on the plaintiff to pay off three mortgages on his Florida homestead. The court allowed the plaintiff an equitable lien on the grounds that the plaintiff stood in the position of the mort-

gage creditors who had been paid and whose claims against the property were excepted from the homestead exemption by Florida law. *See also Jones v. Carpenter*, 90 Fla. 407, 106 So. 127 (1925); *Craven v. Hartley*, 102 Fla. 282, 135 So. 899 (1931); *LaMar v. Lechlider*, 135 Fla. 703, 185 So. 833 (1939); *Sonneman v. Tuszynski*, 139 Fla. 824, 191 So. 18 (1939).

Interestingly, the court acknowledged that this line of cases had been used by some bankruptcy courts to find a judicially created fourth exception to the homestead exemption when a debtor fraudulently transfers assets into a Florida homestead. *See In re Tabone*, 247 B.R. 541, 543 (Bankr.M.D.Fla.2000); *Fid. Serv. Co. v. Grocki (In re Grocki)*, 147 B.R. 274 (Bankr.S.D.Fla.1992); *Friedman v. Luengo (In re South Florida Title, Inc.)*, 104 B.R. 489 (Bankr.S.D.Fla.1989); *In re Gherman*, 101 B.R. 369 (Bankr.S.D.Fla. 1989). *See also Pomerantz v. Pomerantz (In re Pomerantz)*, 215 B.R. 261 (Bankr. S.D.Fla.1997) (denying debtor's discharge from bankruptcy where debtor, a New York resident, transferred nonexempt assets into a Florida homestead for the purposes of defrauding creditor); *In re Bandkau*, 187 B.R. 373 (Bankr.M.D.Fla.1995) (denying homestead exemption); *In re Coplan*, 156 B.R. 88 (Bankr.M.D.Fla.1993) (denying homestead exemption).

Nevertheless, the court concluded that there was no such fourth exception:

> The transfer of nonexempt assets into an exempt homestead with the intent to hinder, delay, or defraud creditors is not one of the three exceptions to the homestead exemption provided in article X, section 4. Nor can we reasonably extend our equitable lien jurisprudence to except such conduct from the exemption's protection. We have invoked equitable principles to reach beyond the literal language of the exceptions only where

funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead.

*Havoco,* 790 So.2d at 1028.

The Florida Supreme Court has also stated the purpose of its homestead law:

> "Homestead laws are founded upon considerations of public policy, their purpose being to promote the stability and welfare of the state by encouraging property ownership and independence on the part of the citizen, and by preserving a home where the family may be sheltered and live beyond the reach of economic misfortune. The statutes are intended to secure to the householder a home for himself and family, regardless of his financial condition—whether solvent or insolvent—without reference to the number of his creditors, and without any special regard to the extent of the estate or title by which the homestead property may be owned. The laws are not based upon the principles of equity; nor do they in any way yield thereto; their purpose is to secure the home to the family even at the sacrifice of just demands, the preservation of the home being deemed of paramount importance."

*Bigelow v. Dunphe,* 143 Fla. 603, 197 So. 328, 330 (1940) (quoting 26 Am.Jur. 10). *See also Collins v. Collins,* 150 Fla. 374, 7 So.2d 443, 444 (1942) ("The purpose of the homestead is to shelter the family and provide it a refuge from the stresses and strains of misfortune.").

### 2.

▮ 11 U.S.C. § 303(i) was intended to accomplish several purposes. One was explicitly stated in the legislative history of the section—to provide a remedy for the business damaged by a wrongful filing:

> Subsection (i) permits the court to award costs, reasonable attorneys' fees,

or damages if an involuntary petition is dismissed other than by consent of all petitioning creditors and the debtor. The damages that the court may award are those that may be caused by the taking of possession of the debtor's property under subsection (g) or section 1104 of the bankruptcy code. In addition, if a petitioning creditor filed the petition in bad faith, the court may award the debtor any damages proximately caused by the filing of the petition. *These damages may include such items as loss of business during and after the pendency of the case, and so on.* "Or" is not exclusive in this paragraph. The court may grant any or all of the damages provided for under the provision. Dismissal in the best interests of creditors under section 305(a)(1) would not give rise to a damages claim. H.R.Rep. No. 595, 95th Cong., 1st Sess. 324 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 34 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5820, 6280 (emphasis added). It is also clear enough that Congress's authorization to award attorney fees and costs was also intended to make the debtor whole. *In re Glannon*, 245 B.R. 882, 894, n. 17 (D.Kan.2000) ("Thus, for the involuntary debtor to be 'made whole,' the availability of statutory attorney fees is the only route[.]"); *In re Mundo Custom Homes, Inc.*, 179 B.R. 566, 571 (Bankr.N.D.Ill.1995) ("The Court finds that the award of attorneys' fees and costs will make the alleged Debtor substantially whole.").

A second purpose for § 303(i) motivated the Congressional authorization to award punitive damages. As stated in *In re K.P. Enter.*, 135 B.R. 174, 183 (Bankr.D.Me. 1992), "The purposes for assessing punitive damages are to punish the wrongdoer, to deter him from repeating his misdeeds, and to set an example so that others will be dissuaded from engaging in such conduct." *See also Camelot v. Hayden*, 30 B.R. 409, 411 (E.D.Tenn.1983); *In re Cannon Express Corp.*, 280 B.R. 450, 462 (Bankr.W.D.Ark.2002); *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.*, 265 B.R. 574, 583 (Bankr.N.D.Ohio 2001); *In re Atlas Mach. & Iron Works, Inc.*, 190 B.R. 796, 803 (Bankr.E.D.Va.1995); *In re Fox Island Square Partnership*, 106 B.R. 962 (Bankr.N.D.Ill.1989); *In re Laclede Cab Co.*, 76 B.R. 687, 694 (Bankr.E.D.Mo. 1987); *In re Johnston Hawks Ltd.*, 72 B.R. 361, 367 (Bankr.D.Hawai'i 1987); *In re Advance Press & Litho, Inc.*, 46 B.R. 700, 706 (Bankr.D.Colo.1984); *In re Grecian Heights Owners' Ass'n*, 27 B.R. 172, 174 (Bankr.D.Or.1982).

In that regard, it is important here to note that the harm from an improper involuntary bankruptcy petition can result not only to the debtor but also to the debtor's owners, employees, suppliers, customers and other creditors. *See In re SBA Factors of Miami, Inc.*, 13 B.R. 99, 101 (Bankr.S.D.Fla.1981) ("An allegation of bankruptcy is a charge that ought not to be made lightly. It usually chills the alleged debtor's credit and his sources of supply. It can scare away his customers. It leaves a permanent scar, even if promptly dismissed.").

■ The third purpose for § 303(i) was to give the federal courts explicit and exclusive control over the damage issue when an involuntary case is dismissed. See Part I.C., above.

### 3.

In the context of this case, the Court must conclude that Florida's homestead exemption is both an attempt to exercise control over JRH's remedies under § 303(i) and an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting

§ 303(i). That conclusion results plainly from the simple observation that if this state regulation of JRH's remedy is given effect, JRH's remedy is severely diminished, but if that regulation is preempted, JRH can more readily realize its federal remedy. Indeed, the difference is $2.8 million, the price of the home. In enacting § 303(i), Congress intended for JRH to be made whole after the injury that Adell caused, and to deter Adell and others from similar conduct. Those objectives simply cannot be met if Florida's homestead exemption is allowed to stand.

On the other hand, the Court must also note that according to the evidence presented, denying Adell this homestead exemption will still fully accomplish Florida's objectives in creating the homestead exemption because he will still have two other homes to give him shelter—one in Michigan and one in California.

Therefore, in this case, Adell's claim of exemption in his Florida home is preempted by § 303(i). Adell will be ordered to sell that property within 60 days and to turnover the proceeds to JRH.

### 4.

Adell argues that in enacting § 303(i), Congress only intended to authorize the federal courts to award a *judgment* for damages and attorney fees, and intended that applicable state law would apply in the *collection* on that judgment, as to both the process of collection and the limits on collection expressed in the states' exemption laws. In support, Adell cites Federal Rule of Civil Procedure 69, which provides in pertinent part:

> The procedure on execution, in proceedings supplementary to and in aid of a judgment, and proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought,

except that any statute of the United States governs to the extent that it is applicable.

FED. R. CIV. P. 69.

There are several difficulties with Adell's argument. First, as this case proves, his argument would make § 303(i) worthless in providing JRH with an effective remedy for the damages he caused.

Second, it would make § 303(i) worthless in accomplishing the objectives of Congress.

Third, the rule itself contains an exception for collection under any applicable federal statute.

■ Fourth, it ignores established Supreme Court precedent on the role and authority of the federal court in enforcing its judgments:

> Jurisdiction is defined to be the power to hear and determine the subject-matter in controversy in the suit before the court, and the rule is universal, that if the power is conferred to render the judgment or enter the decree, *it also includes the power to issue proper process to enforce such judgment or decree.*

*Riggs v. Johnson County,* 6 Wall. 166, 73 U.S. 166, 187, 18 L.Ed. 768 (1868) (emphasis added).

Recently, the Supreme Court re-affirmed this position:

> We have reserved the use of ancillary jurisdiction in subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments. Without jurisdiction to enforce a judgment entered by a federal court, "the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." *Riggs v. Johnson County,* 6 Wall. 166, 187, 18 L.Ed. 768 (1868). In defining that power, we have approved the

exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment, mandamus, garnishment, and the pre-judgment avoidance of fraudulent conveyances.

*Peacock v. Thomas,* 516 U.S. 349, 356, 116 S.Ct. 862, 868, 133 L.Ed.2d 817 (1996) (citations omitted).

 It was Adell who invoked the jurisdiction of this federal court and thus submitted himself to its judgment. Having done that in bad faith, and then having had an appropriate judgment entered against him, he must be required by federal law to respond to that judgment. A federal court has the inherent power to enforce its judgment. *Peacock,* 516 U.S. at 356, 116 S.Ct. at 868. Otherwise, the court's jurisdiction is "incomplete" and "inadequate." *Riggs,* 6 Wall. 166, 73 U.S. at 187.

### 5.

One other issue should be addressed, although Adell has not raised it directly. Plainly the Bankruptcy Code reflects a clear Congressional intent to permit the residents of a state who file for bankruptcy relief to take advantage of that state's exemptions, including, where appropriate, Florida's unlimited homestead exemption. *See Storer v. French (In re Storer),* 58 F.3d 1125, 1128 (6th Cir.1995); *Rhodes v. Stewart,* 705 F.2d 159, 163 (6th Cir.1983). The difference here is that Adell has not filed for bankruptcy relief. Therefore, the exemptions that he would be permitted if he were to file bankruptcy are irrelevant. Rather, as noted above, the issue here is whether Congress intended to permit Adell the unlimited Florida homestead exemption in the unique circumstances of this case.

### II.

 The Court further concludes that even if § 303(i) does not preempt the Florida Homestead law, Adell cannot exempt his home under that law because it is not his homestead.

 "It is well-established that homestead status is established by the actual intention to live permanently in a place coupled with actual use and occupancy." *In re Bratty,* 202 B.R. 1008, 1009 (Bankr.S.D.Fla.1996) (citing *Hillsborough Investment Co. v. Wilcox,* 152 Fla. 889, 13 So.2d 448 (1943); *In re Brown,* 165 B.R. 512 (Bankr.M.D.Fla.1994)). The intent to establish a homestead is evidenced by a person's "specific acts toward creating a permanent abode which are not contradicted by subsequent behavior[.]" *In re Wilbur,* 206 B.R. 1002, 1007 (Bankr.M.D.Fla. 1997). *See also In re Lee,* 223 B.R. 594, 599 (Bankr.M.D.Fla.1998) ("The intention of a person can only be reliably shown by circumstances and acts in support of expressions of intention.") (citing *Semple v. Semple,* 82 Fla. 138, 89 So. 638 (Fla.1921)).

Based on the evidence at the evidentiary hearing, the Court finds that Adell does not have the actual intention to live permanently in Florida. Adell testified that he moved to Florida to protect his assets and because he was embarrassed by this Court's judgment. That judgment is currently on appeal. If the judgment is overturned, Adell's stated reason for moving to Florida will no longer exist. Thus, by Adell's own admission, his move to Florida was more for the purpose of creating a temporary haven than a permanent home. In these circumstances, the Court simply cannot find that Adell has the actual intention to permanently live in Florida.

Curiously, Adell vehemently denied that he moved to Florida to avoid the judg-

ment. Rather, he insisted that the reason was to protect his assets. The Court can only respond that the difference is clusive and that in either event, his intent in moving to Florida was to block JRH as long as necessary, but not to establish a permanent residence there.

Several other considerations undermine the credibility of Adell's testimony regarding his intent to establish residence in Florida.

First, Adell did not move his personal property and effects to his home in Florida. Instead, he placed them in storage in Michigan. Moving one's residence with the permanent intent to relocate is most often accompanied by moving one's personal possessions. Storing his possessions in Michigan is more consistent with an intent to return.

Second, although Adell has leased office space in Florida in which to carry out his responsibilities for Adell Broadcasting Corp., the lease is a six month lease with no provisions for renewal. Further, Adell's office in Michigan is still intact and available for his use. Indeed, there was inconsistent testimony regarding what Adell told his father about his ability to continue working for the Michigan companies from Florida. Adell's father stated that it was not discussed, while Adell testified that it was. This is odd, since Adell is the president of one company and the vice-president of the other. Further, according to Adell's testimony, his father is involved in the day-to-day operations of the companies and thus would presumably need to know how Adell intended to continue working for the Michigan companies after his move to Florida.

Third, Adell's testimony regarding when and what he told his family regarding his "decision" to move to Florida was inconsistent with the testimony of his father and his girlfriend.

Fourth, Adell's girlfriend, whom he stated he intends to marry, testified that she has no plans to move to Florida.

Fifth, Adell did not list his Michigan home for sale before moving to Florida.

Sixth, Adell's actions of filing a declaration of domicile and changing his driver's license are self-serving and do not warrant a different result.

There are two additional considerations which support the Court's conclusion that Adell did not intend to establish a permanent residence, but rather, simply intended to avoid paying the judgment.

First, Adell has actively participated with his employers in a scheme to evade JRH's garnishments of his income. Adell is employed by Adell Broadcasting Corp. and The Word Network, both owned by his father. Adell's income in 1999 was $645,823. His income in 2000 was $935,660. His income in 2001 was $2,277,724. His income in 2002 was $1,705,683. However, when JRH attempted to garnish Adell's wages from Adell Broadcasting Corp., the garnishee disclosure returned by his father's companies indicated that the garnishments could not begin immediately because Adell's income was subject to set-off rights of the company. The testimony of Adell and his father revealed that the company had "loaned" Adell over $300,000 for the purchase of his home in Florida, for attorney fees, and for living expenses, and thus he is allegedly not currently receiving any income. The Court concludes that this arrangement is merely a further attempt by Adell to avoid paying the judgment.

Second, the Court ordered Adell to bring to the hearing all documentation regarding his assets. Adell testified that a baby grand piano located at his home in Michigan actually belongs to his father.

However, Adell produced no documentation in support of that testimony.

"One's testimony with regard to his intention is of course to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts." *District of Columbia v. Murphy*, 314 U.S. 441, 456, 62 S.Ct. 303, 86 L.Ed. 329 (1941). The Court finds that Adell's testimony regarding his homestead claim as to the Florida home lacks credibility and that he does not have the intent to reside in Florida permanently. Accordingly, Adell is not entitled to claim the Florida homestead exemption.

### III.

As noted, JRH seeks additional relief relating to other personal property. Specifically, he seeks an order requiring Adell to turn over to the U.S. Marshal: (1) property that Richard Mazzari took to the office of The Word Network; (2) property that Adell took to the office of Asher Rabinowitz, his Florida counsel; (3) property that was in Adell's Michigan home on the date of the judgment; (4) any cashier's checks or cash in Adell's possession; (5) the proceeds of Adell's sale of his United States Treasury bills in May, 2003; (6) the proceeds of Adell's sale of nine automobiles in May, 2003; (7) the proceeds of Adell's account at Standard Federal Bank on the day the judgment was entered; and (8) the unused portions of any fee retainers paid to his attorneys. Further, JRH seeks an order directing the Michigan Secretary of State to record a lien in favor of JRH on any vehicles titled in Adell's name.

Adell objects, again on the grounds that JRH should be required to use the usual procedures for execution on personal property.

JRH's request is made pursuant to M.C.L. § 600.6104(5), which provides:

After judgment for money has been rendered in an action in any court of this state, the judge may, on motion in that action or in a subsequent proceeding:

(5) Make any order as within his discretion seems appropriate in regard to carrying out the full intent and purpose of these provisions to subject any nonexempt assets of any judgment debtor to the satisfaction of any judgment against the judgment debtor.

M.C.L. § 600.6104(5).

The Court's authority under this statute is very broad. *Rogers v. Webster*, 779 F.2d 52 (6th Cir.1985) ("Michigan has given its courts extremely broad authorization to aid execution on their judgments[.]"). JRH's request is addressed to the discretion of the Court.

The Court concludes that Adell's flagrant disregard of both the judicial process and his obligations to JRH justifies granting JRH's motion, with certain exceptions. As noted, Adell effectively converted certain personal property into his Florida home, including the proceeds of his sale of the United States Treasury bills in May, 2003, the proceeds of his sale of nine automobiles in May, 2003, and the proceeds of his account at Standard Federal Bank. Because this property can no longer be turned over, the Court will not so order.

An appropriate order will be entered.